THE STATE, EX REL. ZUPANCIC ET AL., *v.* LIMBACH, TAX COMMR.

[Cite as State, ex rel. Zupancic, *v.* Limbach (1991), 58 Ohio St. 3d 130.]

(No. 89-734—Submitted November 13, 1990—Decided March 27, 1991.)

*Steven C. LaTourette*, prosecuting attorney, *William L. Sheroke* and *Michael P. Brown*, for relators.

*Lee I. Fisher*, attorney general, and *James C. Sauer*, for respondent.

HOLMES, J. The central issue before this court is whether R.C. 5727.15(C),[1] which classifies taxing districts into one(s) containing an electric company plant having production equipment with an initial cost exceeding $1 billion and ones containing a plant having such property under this amount, is permissible under the Ohio Constitution. For the reasons that follow, we answer this query in the affirmative.

As a threshold to our inquiry we are confronted with respondent's assertion that relators have improperly invoked this court's original jurisdiction. Therefore, we will determine the propriety of the mandamus action under the present facts and then address the merits of relators' request.

I

In respondent's first proposition of law she asserts that relators are attempting to have this court mandate a non-compliance with the respondent's statutory duty, thereby enjoining the respondent. Consequently, the relators' request is for an injunction

---

[1] What is now R.C. 5727.15(C) was originally enacted, in pertinent part, in Am. Sub. S.B. No. 449 as R.C. 5727.15(D). 142 Ohio Laws, Part I, 1633-1634. In 1989, the legislature enacted Am. Sub. S.B. No. 156, renumbering (D) as (C). The language remained unchanged, except for the removal of the word "original" from the final paragraph defining "initial cost."

rather than mandamus. Moreover, respondent claims mandamus is not the appropriate forum to test the constitutionality of R.C. 5727.15(C), since there are adequate remedies at law via a declaratory judgment action.

We note initially that this court's original jurisdiction is triggered when a party files a complaint in mandamus. Section 2(B)(1)(b), Article IV of the Ohio Constitution; R.C. 2731.02. And pursuant to R.C. 2731.01, "mandamus" has been defined as "* * * a writ, issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specifically enjoins as a duty resulting from an office, trust, or station."

Moreover, in order for this court to grant a writ of mandamus we must find "* * * that the relator has a clear legal right to the relief prayed for, that the respondent is under a clear legal duty to perform the requested act, and that relator has no plain and adequate remedy at law." *State, ex rel. Westchester Estates, Inc.*, v. *Bacon* (1980), 61 Ohio St. 2d 42, 15 O.O. 3d 53, 399 N.E. 2d 81, paragraph one of the syllabus; see, also, R.C. 2731.05. Furthermore, this court has indicated on several occasions that it will not entertain injunction actions. In *State, ex rel. Smith*, v. *Indus. Comm.* (1942), 139 Ohio St. 303, 22 O.O. 349, 39 N.E. 2d 838, paragraphs one, two, and three of the syllabus, this court stated:

"Original jurisdiction is conferred upon the Supreme Court by the state Constitution only in *quo warranto*, mandamus, *habeas corpus*, prohibition and *procedendo*. The court is without authority to entertain an action in injunction instituted therein.

"A writ of mandamus compels action or commands the performance of a duty, while a decree of injunction ordinarily restrains or forbids the performance of a specified act.

"A proceeding wherein an order is sought directing the Industrial Commission of Ohio to 'cease disbursing' certain funds is essentially one in injunction and not mandamus, and is not within the original jurisdiction of the Supreme Court."

Thus, this court will scrutinize pleadings in order to assure that actions filed by parties requesting mandamus relief are consistent with our prior decisions as to the form and substance of the relief sought. For example, in *State, ex rel. Pressley*, v. *Indus. Comm.* (1967), 11 Ohio St. 2d 141, 40 O.O. 2d 141, 228 N.E. 2d 631, paragraphs four and five of the syllabus, this court acknowledged that it would go beyond the pleadings to determine whether the desired relief was actually for mandamus:

"Where a petition filed in the Supreme Court or in the Court of Appeals is in the form of a proceeding in mandamus but the substance of the allegations makes it manifest that the real object of the relator is for an injunction, such a petition does not state a cause of action in mandamus and since neither the Supreme Court nor the Court of Appeals has original jurisdiction in injunction the action must be dismissed for want of jurisdiction. (*State, ex rel. Stine*, v. *McCaw*, 136 Ohio St. 41; *State, ex rel.*, v. *Hahn*, 50 Ohio St. 714; *State, ex rel. Libbey-Owens-Ford Glass Co.*, v. *Industrial Commission*, 162 Ohio St. 302, approved and followed.)

"Where a petition stating a proper cause of action in mandamus is filed originally in the Supreme Court, and it is determined that there is no plain and adequate remedy in the ordinary course of the law by way of an appeal, the Supreme Court has no authority to exercise jurisdictional discretion and the refusal to exercise jurisdiction on the ground that either of the extraordinary remedies of statutory man-

datory injunction (Section 2727.01 *et seq.*, Revised Code) or statutory mandamus (Section 2731.01 *et seq.*, Revised Code) is available in the Common Pleas Court, is constitutionally impermissible under the last sentence of Section 2 of Article IV of the Ohio Constitution. \*\*\*" (Citations omitted.)

In the case at bar, relators do not seek a prohibitory injunction. Although the relators' request is for this court to have the respondent refrain from exercising her statutory responsibility, the essence of their request is for respondent to abide by a former statute. In exercising our original jurisdiction we will necessarily have to address the constitutionality of R.C. 5727.15(C) and decide whether to prevent respondent from carrying out the task required under the present apportionment statute; however, these decisions are only ancillary to our consideration of the writ itself on the merits.

This court has previously held that a mandamus action may test the constitutionality of a statute. *State, ex rel. Michaels*, v. *Morse* (1956), 165 Ohio St. 599, 608, 60 O.O. 531, 536, 138 N.E. 2d 660, 666 ("[t]he right of relator to question, by mandamus, the constitutionality of the statute is recognized in Ohio"); *State, ex rel. Brown*, v. *Summit Cty. Bd. of Elections* (1989), 46 Ohio St. 3d 166, 167, 545 N.E. 2d 1256, 1258. Moreover, where this court has found a statute unconstitutional it may direct the public bodies or officials to follow a constitutional course in completing their duties. See *State, ex rel. Park Invest. Co.*, v. *Bd. of Tax Appeals* (1971), 26 Ohio St. 2d 161, 55 O.O. 2d 238, 270 N.E. 2d 342 (where this court in a mandamus proceeding directed the Board of Tax Appeals to comply with this court's earlier decision in the same case after finding two tax statutes unconstitutional).

Furthermore, this court has recog-

nized that the availability of a declaratory judgment or mandatory injunction action will not usually defeat a request for a writ of mandamus under certain conditions. Specifically, in *State, ex rel. Fenske*, v. *McGovern* (1984), 11 Ohio St. 3d 129, 11 OBR 426, 464 N.E. 2d 525, paragraphs one and two of the syllabus provide:

"The extraordinary remedy of mandatory injunction in the court of common pleas is not a plain and adequate remedy in the ordinary course of law precluding exercise of the original jurisdiction in mandamus conferred upon a court of appeals by Section 3, Article IV of the Ohio Constitution. (Paragraph six of the syllabus of *State, ex rel. Pressley*, v. *Indus. Comm.*, 11 Ohio St. 2d 141 [40 O.O. 2d 141], approved and followed.)

"The availability of an action for declaratory judgment does not bar the issuance of a writ of mandamus if the relator demonstrates a clear legal right thereto, although the availability of declaratory judgment may be considered by the court as an element in exercising its discretion whether a writ should issue. However, where declaratory judgment would not be a complete remedy unless coupled with ancillary relief in the nature of mandatory injunction, the availability of declaratory injunction is not an appropriate basis to deny a writ to which the relator is otherwise entitled."

See, also, *State, ex rel. Merydith Constr. Co.*, v. *Dean* (1916), 95 Ohio St. 108, 123, 116 N.E. 37, 41 (for a remedy at law to be adequate, the remedy should be complete in its nature, beneficial and speedy); *State, ex rel. Butler*, v. *Demis* (1981), 66 Ohio St. 2d 123, 124, 20 O.O. 3d 121, 122, 420 N.E. 2d 116, 117 (the question for this court to decide is whether an alternative remedy is adequate under the circumstances).

In the present case relators would

have a clear legal right to have respondent proceed under the former apportionment formula if we found R.C. 5727.15(C), in its present form, unconstitutional. Although relators could seek a declaratory judgment coupled with a mandatory injunction in order to achieve nearly the same result we find that the alternative remedy would not be as complete as a writ of mandamus. Ultimately, if any court would declare R.C. 5727.15(C) unconstitutional, the relators could still be forced to request a writ of mandamus in order · to have respondent follow the apportionment formula requested in their complaint and/or a prohibitory injunction to enjoin respondent from exercising her statutory duties under the challenged statute. Accordingly, we hold that relators have properly brought this mandamus action before the court since all alternative remedies at law are wholly inadequate.[2]

## II

The key issue in the case *sub judice* is whether R.C. 5727.15(C) operates

uniformly. Section 26, Article II of the Ohio Constitution provides: "All laws, of a general nature, shall have a uniform operation throughout the state * * *." Relators contend that the distributive features of the statute are not uniform, and that the statute lacks a rational basis or legitimate state interest. We disagree.

In order to address the uniformity challenge to the statute it is necessary to review the historical underpinnings of the statute and its amendments. Prior to Am. Sub. S.B. No. 449, in cases where the taxable property of an electric company was located in more than one taxing district, the respondent, under former R.C. 5727.15(D),[3] apportioned seventy percent of the value of the company's production plant equipment and station equipment to the taxing district ("situs district") in which the property was physically located. The remaining thirty percent, along with the value of all other taxable property, was apportioned to the other taxing districts[4] in the proportion that the cost of all transmission

---

[2] We note that there are instances where exigent circumstances may call for this court to exercise its jurisdiction to order a writ of mandamus in cases where an appeal is an available remedy. However, the mere assertion by a relator that the appellate process is lengthy and the accelerated nature of mandamus is preferred does *not* entitle the relator to such an extraordinary writ. In the present case, relators have failed to show why an action filed initially with the common pleas court and appealed therefrom would substantially impair their rights. However, due to the nature of the relief requested here (determination of the constitutionality of R.C. 5727.15[C], an order enjoining respondent from exercising her statutory duty, and an order compelling respondent to proceed with apportionment under former R.C. 5727.15[D]), we will address the request for the writ on its merits.

[3] Former R.C. 5727.15(D) provided:

"In the case of an electric company, seventy per cent of the value of all steam, nuclear, hydraulic, and other production plant equipment and of all station equipment shall be apportioned to the taxing district in which such property is physically located, and the remaining value of such property, together with the value of all other taxable property, shall be apportioned to each taxing district in the per cent that the cost of all transmission and distribution property physically located in the taxing district is of the total cost of all transmission and distribution property physically located in this state." 141 Ohio Laws, Part I, 452, 453.

[4] According to the Legislative Service Commission's Analysis of Am. Sub. S.B. No. 449, As Introduced, at 1, fn. 2:
"For purposes of the public utility per-

and distribution ("T&D") property physically located in the particular taxing district bore to the total cost of all such property physically located in Ohio. 141 Ohio Laws, Part I, 452, 453.

The General Assembly enacted Am. Sub. S.B. No. 449, effective November 18, 1988, in order to distribute some of the value of highly costly electric plants among several T&D districts to which the generated power flows and, as a consequence, reduced the amount apportioned to the situs district in which the plant is located. See 142 Ohio Laws, Part I, 1630, 1633-1634. The legislation was in response, in part, to the Perry Nuclear Power Plant and other future facilities of the same size and cost. See Legislative Service Comm. Bill Analysis on Am. Sub. S.B. No. 449 (As Introduced). (The Perry Nuclear Power Plant was described in the report as a "* * * plant, the cost of which is unmatched by any other utility plant in the state * * * [and] changes in the method by which the Perry Plant is valued and taxed, and in how that value is apportioned would have some effect on subdivisions in 46 counties.") The pertinent portion of Am. Sub. S.B. No. 449, or R.C. 5725.15(C)[5] as now

---

sonal property tax, a 'taxing district' means a geographical area in which the rate of taxation is uniform. Consequently, a taxing district is not a particular subdivision that levies taxes, or even a combination of several subdivisions, but rather portions of overlapping subdivisions through which the aggregate tax rate is the same."

[5] Effective December 31, 1989, R.C. 5727.15(D) was renumbered (C), and was slightly amended to delete the word "original" from the definition of "initial cost" in the final paragraph. R.C. 5727.15 now provides in part:

"(C) In the case of an electric company:

"(1) Seventy per cent of the value of all production equipment and of all station equipment that is not production equipment shall be apportioned to the taxing district in which such property is physically located; and

"(2) The remaining value of such property, together with the value of all other taxable property, shall be apportioned to each taxing district in the per cent that the cost of all transmission and distribution property physically located in the taxing district is of the total cost of all transmission and distribution property located in this state.

"(3) If an electric company's taxable value for the current year includes the value of any production equipment at a plant at which the initial cost of the plant's production equipment exceeded one billion dollars, then prior to making the apportionments required for that company by divisions (C)(1) and (2) of this section, the tax commissioner shall do the following:

"(a) Subtract four hundred twenty million dollars from the total taxable value of the production equipment at that plant for the current tax year.

"(b) Multiply the difference thus obtained by a fraction, the numerator of which is the portion of the taxable value of that plant's production equipment included in the company's total value for the current tax year, and the denominator of which is the total taxable value of such equipment included in the total taxable value of all electric companies for such year.

"(c) Apportion the product thus obtained to taxing districts in the manner prescribed in division (C)(2) of this section.

"(d) Deduct the amounts so apportioned from the taxable value of the company's production equipment at the plant, prior to making the apportionments required by divisions (C)(1) and (2) of this section.

"For purposes of division (C) of this section, 'initial cost' applies only to production equipment of plants placed in commercial operation on or after January 1, 1987, and means the cost of all production equipment at a plant for the first year the plant's equipment was subject to taxation.

"(D) In the case of all other public utilities, the value of the property to be ap-

codified, dictates that the respondent first subtract $420 million from the total taxable value of an electric company's production equipment at any single plant, which equipment had an initial cost[6] exceeding $1 billion. Apparently, this $420 million is to be apportioned seventy percent to the situs district and thirty percent to the T&D districts. Next, respondent multiplies the difference by a fraction which has as its numerator the portion of the taxable value of that plant's production equipment included in the company's total value for the current year, and as its denominator the total taxable value of such equipment included in the total taxable value of all electric companies for such year.[7] Finally, respondent apportions the resulting product to the T&D districts.

Additionally, for tax years 1989 and 1990, the respondent is required to apportion twenty percent and ten per-

portioned shall be apportioned to each taxing district in proportion to the entire value of such property within this state."

The provisions of Section 7 of Am. Sub. S.B. No. 449 were amended by the 118th General Assembly to read as follows:

"Sec. 7. (A) Notwithstanding division (C)(3)(c) of section 5727.15 of the Revised Code as enacted by Am. Sub. S.B. 449 of the 117th General Assembly and amended by this act, for tax year 1989, apportion the amount obtained under division (C)(3)(b) of that section as follows: 20 per cent to the taxing district where the property is physically located, and 80 per cent among taxing districts where the company has transmission and distribution property in accordance with division (C)(2) of that section.

"(B) Notwithstanding division (C)(3)(c) of section 5727.15 of the Revised Code as enacted by Am. Sub. S.B. 449 of the 117th General Assembly and amended by this act, for tax year 1990, apportion the amount obtained under division (C)(3)(b) of that section as follows: 10 per cent to the taxing district where the property is physically located, and 90 per cent among taxing districts where the company has transmission and distribution property in accordance with division (C)(2) of that section." Am. Sub. S.B. No. 156, Section 3.

Am. Sub. S.B. No. 449 provided in part: "Section 5. The amendment in this act of section 5727.15 of the Revised Code with respect to percentage of valuation of production equipment to be apportioned among taxing districts shall first apply to apportionments of the value of electric companies' personal property for the 1989 tax year." 142 Ohio Laws, Part I, 1635.

[6] The initial cost of production equipment equals "*** the cost of all production equipment at a plant for the first year the plant's equipment was subject to taxation." R.C. 5727.15(C)(3)(d). Formerly, the original cost of an electrical company's equipment was reduced by fifty percent to determine its true value, which was also its taxable value. Former R.C. 5727.12(B)(1). 142 Ohio Laws, Part I, 1632. Thus, the respondent deducted $420 million from an amount that was fifty percent of the equipment's original cost. R.C. 5727.12(B) was repealed by Am. Sub. S.B. No. 156, effective December 31, 1989.

[7] According to the Legislative Service Commission's Bill Analysis on Am. Sub. S.B. No. 449, at 6, the "*** apportionments, while described *** in terms of the plant's total value, would be made separately for each electric company that owns property at the plant. Toward this end, each electric company that owns (or leases pursuant to a sale and leaseback arrangement) production equipment at the plant would have a share of the taxable value of that equipment apportioned under the new procedure. The company's share of the plant's taxable value in excess of $420 million, to be apportioned in accordance with the new directions, would be proportional to its share of the taxable value of production equipment at the plant. That company's share would be apportioned based on its transmission and distribution lines."

cent, respectively, of amounts *over* $420 million to the situs district and eighty percent and ninety percent, respectively, to the T&D districts.[8] Section 7 of Am. Sub. S.B. 449, 142 Ohio Laws, Part I, 1636. However, in tax years 1991 and beyond, the situs district shall receive seventy percent of the taxable value on the first $420 million but will receive *zero* percent of the taxable value calculated in excess of $420 million, with the balance of the proceeds going to the T&D districts. See R.C. 5727.15(C)(3)(c).[9]

Turning to the issues at bar, relators assert that the distributive features of Am. Sub. S.B. No. 449 are not uniform and that R.C. 5727.15(C) lacks a rational basis or connection to any legitimate state interest. Preliminarily, we note that relators' arguments, in part, indicate that if the act is invalid under the uniformity provision it would also violate the equal protection provision of the Ohio Constitution. Since this court decided that political subdivisions lack standing to assert due process and equal protection claims against the state, we will not reach the merits of relators' equal protection claims in this instance. *Avon Lake City School Dist.* v. *Limbach* (1988), 35 Ohio St. 3d 118, 518 N.E. 2d 1190.

The relators argue that the General Assembly's attempt to distribute the unprecedented revenue increase resulting from the Perry Nuclear Power Plant among T&D districts at the expense of the situs district denies the situs district equal and fair treatment. In *Hixson* v. *Burson* (1896), 54 Ohio St. 470, 43 N.E. 1000, this court invalidated a statute which authorized a certain county to provide for the construction, improvement and repair of public highways, because although the subject matter was general, its operation and effect were local and contrary to Section 26, Article II of the Ohio Constitution. *Id.* at paragraph two of the syllabus. The *Hixson* court discussed the distinction between general and local statutes under Section 26, Article II by noting:

"* * * [E]very subject of legislation is either of a general nature on the one hand, or local or special on the other. It can not be in its nature both general and special, because the two are inconsistent. If it is of a general nature, the constitution requires that *all* laws — not *some* laws — on that subject shall have a uniform operation throughout the state.

"But how are we to determine whether a given subject is of a general nature? One way is this: if the subject

---

[8] Thus, for example, in tax year 1989 respondent was required to apportion seventy percent of the first $420 million and twenty percent of the excess over $420 million to the situs district. See Legislative Service Comm. Bill Analysis on Am. Sub. S.B. No. 449, at 6 ("* * * under the new procedures, the first $420 million of the value of the production equipment of such a plant would be apportioned under the '70/30' method * * *").

[9] Under Section 8 of Am. Sub. S.B. No. 449, a board of education was afforded the opportunity, within five days of the effective date of the Act, to notify the respondent that it had passed a resolution to levy a tax for current expenses to be placed on the ballot at the November 1988 general election, but withdrew the levy proposal or reduced the proposed rate of the levy in response to the respondent's preliminary 1988 valuation of the electric companies that own the Perry Nuclear Power Plant. The respondent must increase the valuation apportioned to the school district for the 1988 tax year in order to compensate the district for its anticipated loss of revenue.

does or may exist in, and affect the people of, every county, in the state, it is of a general nature. On the contrary, if the subject cannot exist in, or affect the people of every county, it is local or special. A subject matter of such general nature can be regulated and legislated upon by general laws having a uniform operation throughout the state, and a subject matter which cannot exist in, or affect the people of every county, can not be regulated by general laws having a uniform operation throughout the state, because a law can not operate where there can be no subject matter to be operated upon." *Id.* at 481, 43 N.E. at 1001-1002.

Historically, tax statutes have been viewed by this court to be of a general nature. See *State, ex rel. Wilson,* v. *Lewis* (1906), 74 Ohio St. 403, 415, 78 N.E. 523, 525; *Miller* v. *Korns* (1923), 107 Ohio St. 287, 301, 140 N.E. 773, 777. And wherever taxation has been reviewed we have emphasized the importance of uniformity in the operation of the statute. See *Aluminum Co. of America* v. *Evatt* (1942), 140 Ohio St. 385, 401, 24 O.O. 405, 412, 45 N.E. 2d 118, 126.

In discussing the criteria for determining whether a statute operates uniformly, this court has stated:

"*** Section 26, Art. II of the Constitution, was not intended to render invalid every law which does not operate upon all persons, property or political subdivisions within the state. It is sufficient if a law operates upon every person included within its operative provisions, provided such operative provisions are not arbitrarily and unnecessarily restricted. And the law is equally valid if it contains provisions which permit it to operate upon every locality where certain specified conditions prevail. A law operates as an unreasonable classification where it seeks to create artificial distinctions where no real distinction exists. ***" *State, ex rel. Stanton,* v. *Powell* (1924), 109 Ohio St. 383, 385, 142 N.E. 401.

Furthermore, a statute is deemed to be uniform despite applying to only one case so long as its terms are uniform and it may apply to cases similarly situated in the future. See *State, ex rel. Core,* v. *Green* (1953), 160 Ohio St. 175, 183, 51 O.O. 442, 445, 115 N.E. 2d 157, 161-162; *Miller* v. *Korns, supra,* at 295, 140 N.E. at 775 ("*** There is considerable authority to the effect that so long as a tax is uniformly laid the Legislature may appropriate the proceeds of that tax by a rule that is not uniform, in case the appropriation is reasonable and made in pursuance of a valid and legitimate state purpose"). Moreover, the General Assembly may recognize existing conditions and enact statutes which are deemed uniform for dealing with those unequal conditions in a rational way rather than attempt to compel their application to conditions where they could have no possible effect. *State, ex rel. Stanton,* v. *Powell, supra,* at 385-386, 142 N.E. at 401.

In the present case neither party disputes that the taxing statute is of a general nature. Clearly, R.C. 5727.15 (C) may apply to any county in the state. Although the statute may presently apply to one particular electric power plant with an initial cost exceeding $1 billion, there is nothing within the Act itself to prevent its prospective operation upon any electric power plant similarly situated throughout the state. Furthermore, we find that the General Assembly's classification of electric power plants with initial production equipment costs exceeding $1 billion is reasonable in light of the enormous cost of building a modern generating facility. The increased revenue that would befall a situs

district, absent the statute, supports the legislative attempt to distribute the revenue windfall among other taxing districts in which there are transmission and distribution lines for the power generated by the production equipment. Here, the General Assembly properly premised the revenue distribution among the T&D districts on the transmission or receipt of electrical power generated by the electric plant. This seems logical in light of the fact that without the power demand from the T&D districts, the electric plant would not need the production equipment.

We are aware that R.C. 5727.15(C) will create some disparities between situs districts which have electric plants exceeding a start-up cost of $1 billion and those that do not.[10] However, as a general rule disparities due to bracket classifications do not automatically render such classifications unreasonable. Rather, pursuant to Section 26, Article II of the Ohio Constitution, this court will look to the purpose underlying the statutory classification and if the statute achieves a legitimate governmental purpose and operates equally on all persons or entities included within its provisions, it shall be deemed constitutional. See *State, ex rel. Stanton,* v. *Powell, supra; Miller* v. *Korns, supra.*

Therefore, we hold that R.C. 5727.15(C) is a general statute that operates uniformly since it may apply to any taxing district in the state which contains an electric plant with an initial cost of plant production equipment exceeding $1 billion, it is premised on a calculable cost element of power production, and it operates equally on all taxing districts which fall within its provisions.

Accordingly, for the foregoing reasons, the relators' application for a writ of mandamus is denied.

*Writ denied.*

MOYER, C.J., SWEENEY, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.

---

[10] A disparity occurs in the tax treatment of situs districts having electric plants with an initial equipment cost exceeding $1 billion and those with an initial cost less than $1 billion. The latter districts receive seventy percent of the *full* value, as determined by the respondent, whereas the districts having initial equipment costs exceeding $1 billion receive *only* seventy percent of the first $420 million.