[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 1.]

SIMMONS-HARRIS ET AL., APPELLEES AND CROSS-APPELLANTS, *v.* GOFF, SUPT., ET AL., APPELLANTS AND CROSS-APPELLEES.

GATTON ET AL., APPELLEES, *v*. GOFF, SUPT., ET AL., APPELLANTS.

[Cite as *Simmons-Harris v. Goff*, 1999-Ohio-77.]

*Schools—Current School Voucher Program violates the one-subject rule, Section 15(D), Article II of the Ohio Constitution—R.C. 3313.977(A)(1)(d) is unconstitutional.*

(No. 97-1117—Submitted September 28, 1998—Decided May 27, 1999.)

APPEALS and CROSS-APPEAL from the Court of Appeals for Franklin County, Nos. 96APE08-982 and 96APE08-991.

_____

{¶ 1} On June 28, 1995, the General Assembly of the state of Ohio adopted Am.Sub.H.B. No. 117, the biennial operating appropriations bill for fiscal years 1996 and 1997. 146 Ohio Laws, Part I, 898. Among the provisions were those establishing the Pilot Project Scholarship Program, commonly known as the School Voucher Program. See R.C. 3313.974 through 3313.979.

{¶ 2} The School Voucher Program requires the State Superintendent of Public Instruction to provide scholarships to students residing within Cleveland City School District.[1] R.C. 3313.975(A). Students receiving scholarships may use them only to attend an "alternative school," *id*., which is defined as a registered private school or a public school located in an adjacent school district. R.C. 3313.974(G). The scholarships are ninety percent (for students with family income below two hundred percent of the maximum income level established by the

_____

1. The Pilot Project Scholarship Program also requires the state superintendent to provide tutorial assistance grants. R.C. 3313.975(A). As the provisions governing tutorial assistance have not been challenged in this case, we need not explain or discuss them.

superintendent) or seventy-five percent (for students with family income at or above two hundred percent of that level) of the lesser of the actual tuition charges or an amount to be established by the superintendent not to exceed $2,500. R.C. 3313.978(A) and (C)(1). The number of scholarships available in a given year is limited by the amount appropriated by the General Assembly. R.C. 3313.975(B).

{¶ 3} Scholarship funds are made available in the form of checks. A check for a student enrolled in a registered private school is payable to the student's parents; a check for a student enrolled in an adjacent public school district is payable to that school district. R.C. 3313.979. Checks for students enrolled in registered private schools are sent to the school, where the parents are required to endorse the checks to the school. This mechanism, which is not part of the statutory scheme, ensures that the scholarship funds are expended on education.

{¶ 4} On January 10, 1996, Sue Gatton, Millie Waterman, Walter Hertz, Reverend James Watkins, Robin McKinney, Loretta Heard, Reverend Don Norenburg, Deborah Schneider, and the Ohio Federation of Teachers ("Gatton") filed suit against the state of Ohio and John M. Goff, the state superintendent, asserting that the School Voucher Program violated various provisions of the Ohio Constitution and the Establishment Clause of the First Amendment to the United States Constitution. On January 31, 1996, Doris Simmons-Harris, Sheryl Smith, and Reverend Steven Behr ("Simmons-Harris") filed suit against the state superintendent, challenging the constitutionality of the School Voucher Program. The cases were consolidated, and the state moved for summary judgment. Summary judgment was granted. Gatton and Simmons-Harris appealed.

{¶ 5} The court of appeals declared the School Voucher Program to be unconstitutional, holding it violative of the Establishment Clause of the First Amendment to the United States Constitution; the School Funds Clause of Section 2, Article VI of the Ohio Constitution; the Establishment Clause of Section 7, Article I of the Ohio Constitution; and the Uniformity Clause of Section 26, Article

II of the Ohio Constitution. The court of appeals also held that the School Voucher Program did not violate the Thorough and Efficient Clause of Section 2, Article VI of the Ohio Constitution, or the single-subject rule of Section 15(D), Article II of the Ohio Constitution.

{¶ 6} The cause is now before this court pursuant to the allowance of discretionary appeals and a cross-appeal.

———————————

*Robert H. Chanin* and *John M. West, pro hac vice; Cloppert, Portman, Sauter, Latinick & Foley, David G. Latanick* and *William J. Steel; Christopher A. Lopez, Steven R. Shapiro, Joan M. Englund, Elliot M. Mincberg, Judith Schaeffer* and *Steven K. Green,* for appellees and cross-appellants Doris Simmons-Harris et al.

*Benesch, Friedlander, Coplan & Aronoff, L.L.P., Donald J. Mooney, Jr., Mark D. Tucker* and *Roger L. Schantz; Marvin E. Frankel, pro hac vice,* and *Justine A. Harris,* for appellees Sue Gatton et al.

*Betty D. Montgomery,* Attorney General, *Jeffrey S. Sutton; Sharon A. Jennings*, *Roger F. Carroll* and *Elizabeth K. Ziewacz*, Assistant Attorneys General, for appellants and cross-appellees John M. Goff and the state of Ohio.

*Squire, Sanders & Dempsey, L.L.P., David J. Young, Scott L. Marrah* and *Michael R. Reed; Wegman, Hessler, Vanderburg & O'Toole, David Hessler* and *Nathan Hessler; Chester, Willcox & Saxbe* and *John J. Chester*, for appellants and cross-appellees Hanna Perkins School et al.

*Clint Bolick, pro hac vice, William H. Mellor III* and *Richard D. Komer; Reminger & Reminger* and *Kevin Foley,* for appellants and cross-appellees Hope for Cleveland's Children et al.

*Melnick & Melnick* and *Robert R. Melnick; John W. Whitehead* and *Steven H. Aden,* urging reversal for *amicus curiae* Rutherford Institute.

*Zeiger & Carpenter, John W. Zeiger* and *Marion H. Little, Jr.,* urging reversal for *amici curiae* Citizens for Educational Freedom, Parents Rights Organization, and Education Freedom Foundation.

*Nathan J. Diament, pro hac vice,* urging reversal for *amicus curiae* Institute for Public Affairs, Union of Orthodox Jewish Congregations of America.

*Hugh Calkins* and *John K. Sullivan*, *amici curiae*, urging reversal.

*Miller, Cassidy, Larroca & Lewin, L.L.P., Nathan Lewin* and *Richard W. Garnett;* and *Dennis Rapps,* urging reversal for *amici curiae* the National Jewish Commission on Law and Public Affairs, Agudath Harabonim of the United States and Canada, National Council of Young Israel, Rabbinical Alliance of America, Rabbinical Council of America, Torah Umesorah, National Society of Hebrew Day Schools, Agudath Israel of America, and Union of Orthodox Jewish Congregations of America.

*Kevin J. Hasson, Eric W. Treene* and *Roman P. Storzer,* urging reversal for *amicus curiae* Becket Fund for Religious Liberty.

*Thomas G. Hungar* and *Eugene Scalia, pro hac vice*, urging reversal for *amici curiae* Center for Education Reform, Representative William F. Adolph, Jr., American Legislative Exchange Council, Arkansas Policy Foundation, ATOP Academy, Center for Equal Opportunity, CEO America, Representative Henry Cuellar, Education Leaders Council, Floridians for Educational Choice, Maine School Choice Coalition, Reach Alliance, Texas Coalition for Parental Choice in Education, United New Yorkers for Choice in Education, "I Have a Dream" Foundation of Washington, D.C., Institute for Transformation of Learning, Liberty Counsel, Milton & Rose D. Friedman Foundation, Minnesota Business Partnership, National Federation of Independent Business, North Carolina Education Reform Foundation, Pennsylvania Manufacturers Association, Putting Children First, Mayor Bret Schundler, Texas Justice Foundation, and Toussaint Institute.

*Goldstein & Roloff* and *Morris L. Hawk,* urging affirmance for *amicus curiae* Ohio Coalition for Equity and Adequacy in School Funding.

*Wolman, Genshaft & Gellman* and *Benson A. Wolman,* urging affirmance for *amicus curiae* National Committee for Public Education & Religious Liberty.

*Patrick F. Timmins, Jr.,* urging affirmance for *amicus curiae* Coalition of Rural and Appalachian Schools.

———————————

**PFEIFER, J**.

{¶ 7} The court of appeals ruled on six substantive constitutional issues. We will address each of them in turn. We conclude that the current School Voucher Program generally does not violate the Establishment Clause of the First Amendment to the United States Constitution or the Establishment Clause of Section 7, Article I of the Ohio Constitution, and does not violate the School Funds Clause of Section 2, Article VI of the Ohio Constitution, the Thorough and Efficient Clause of Section 2, Article VI of the Ohio Constitution, or the Uniformity Clause of Section 26, Article II of the Ohio Constitution. We also conclude that the current School Voucher Program does violate the one-subject rule, Section 15(D), Article II of the Ohio Constitution. Further, we conclude that former R.C. 3313.975(A) does violate the Uniformity Clause of Section 26, Article II of the Ohio Constitution. Accordingly, we affirm in part and reverse in part.

I

{¶ 8} The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *." In *Cantwell v. Connecticut* (1940), 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218, the Supreme Court stated that "[t]he Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws." Thus, Ohio's General Assembly is proscribed from enacting laws respecting an establishment of religion.

{¶ 9} In *Lemon v. Kurtzman* (1971), 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, the Supreme Court set forth a three-prong test to determine whether the Establishment Clause has been violated. Various Supreme Court Justices have challenged the continuing validity of the *Lemon* test. See *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.* (1993), 508 U.S. 384, 398-399, 113 S.Ct. 2141, 2149-2150, 124 L.Ed.2d 352, 364 (Scalia, J., concurring); *Allegheny Cty. v. Am. Civ. Liberties Union, Greater Pittsburgh Chapter* (1989), 492 U.S. 573, 655-657, 109 S.Ct. 3086, 3134-3135, 106 L.Ed.2d 472, 535 (Kennedy, J., joined by Rehnquist, C.J., White and Scalia, JJ., concurring in the judgment in part and dissenting in part); *Westside Community Schools Bd. of Edn. v. Mergens* (1990), 496 U.S. 226, 258, 110 S.Ct. 2356, 2376, 110 L.Ed.2d 191, 221 (Kennedy, J., joined by Scalia, J., concurring in part and concurring in the judgment). See, also, Nowak & Rotunda, Constitutional Law (5 Ed.1995) 1223, Section 17.3, fn. 1. Nevertheless, *Lemon* remains the law of the land, and we are constrained to apply it. In its most recent Establishment Clause case, the Supreme Court used the principles set forth in the *Lemon* test, even as it modified the analytical framework of the three prongs. *Agostini v. Felton* (1997), 521 U.S. 203, 223, 230-233, 117 S.Ct. 1997, 2010, 2014-2015, 138 L.Ed.2d 391, 414, 419-421.

{¶ 10} According to *Lemon*, a statute does not violate the Establishment Clause when (1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not excessively entangle government with religion. *Lemon*, 403 U.S. at 612-613, 91 S.Ct. at 2111, 29 L.Ed.2d at 755.

{¶ 11} The first prong of the *Lemon* test is satisfied when the challenged statutory scheme was enacted for a secular legislative purpose. On its face, the School Voucher Program does nothing more or less than provide scholarships to certain children residing within the Cleveland City School District to enable them to attend an alternative school. Nothing in the statutory scheme, the record, or the briefs of the parties suggests that the General Assembly intended any other result.

We conclude that the School Voucher Program has a secular legislative purpose and that the challenged statutory scheme complies with the first prong of the *Lemon* test.

**{¶ 12}** The second prong of the *Lemon* test is satisfied when the primary effect of a challenged statutory scheme is neither to advance nor to inhibit religion. Appellees argue that *Commt. for Pub. Edn. & Religious Liberty v. Nyquist* (1973), 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948, compels a holding that the School Voucher Program unconstitutionally advances religion. In *Nyquist*, a program that provided direct money grants to certain nonpublic schools for repair and maintenance, reimbursed low-income parents for a portion of the cost of private school tuition, including sectarian school tuition, and granted other parents certain tax benefits was ruled unconstitutional. The court held that there was no way to ensure that the monies received pursuant to the tuition-reimbursement portion of the program, even though received directly by the parents and only indirectly by the schools, would be restricted to secular purposes. *Id.* at 794, 93 S.Ct. at 2976, 37 L.Ed.2d at 975. Therefore, according to the court, the program had "the impermissible effect of advancing the sectarian activities of religious schools." *Id.* at 794, 93 S.Ct. at 2976, 37 L.Ed.2d at 975.

**{¶ 13}** The *Nyquist* holding has been undermined by subsequent case law that culminated in the court stating, "[W]e have departed from the rule * * * that all government aid that directly aids the educational function of religious schools is invalid." *Agostini*, 521 U.S. at 225, 117 S.Ct. at 2011, 138 L.Ed.2d at 415. See *Witters v. Washington Dept. of Serv. for the Blind* (1986), 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (state provision of vocational aid to a blind person, who used it to attend a Christian college, held constitutional). Thus, we continue our analysis of the impermissible-effect prong of the *Lemon* test unburdened by the bright-line *Nyquist* test advocated by appellees.

**{¶ 14}** In *Agostini*, the court stated that its understanding of the criteria used to assess whether aid to religion has an impermissible effect had changed. *Id.*, 521 U.S. at 223, 117 S.Ct. at 2010, 138 L.Ed.2d at 414. According to the *Agostini* court, the three primary criteria to use to evaluate whether government aid has the effect of advancing religion are (1) whether the program results in governmental indoctrination, (2) whether the program's recipients are defined by reference to religion, and (3) whether the program creates an excessive entanglement between government and religion. *Id.* at 230-233, 117 S.Ct. at 2014-2015, 138 L.Ed.2d at 419-421. In applying this test, we bear in mind that analysis of Establishment Clause jurisprudence is not a "legalistic minuet in which precise rules and forms must govern." *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112, 29 L.Ed.2d at 757.

**{¶ 15}** Among the factors to consider to determine whether a government program results in indoctrination is whether a "symbolic link" between government and religion is created. *Agostini*, 521 U.S. at 224, 117 S.Ct. at 2011, 138 L.Ed.2d at 415. It can be argued that the government and religion are linked in this case because the School Voucher Program results in money flowing from the government to sectarian schools. We reject the argument, primarily because funds cannot reach a sectarian school unless the parents of a student decide, independently of the government, to send their child to that sectarian school. See *Zobrest v. Catalina Foothills School Dist.* (1993), 509 U.S. 1, 8, 113 S.Ct. 2462, 2466, 125 L.Ed.2d 1, 10 (government programs that naturally provide benefits to a broad class of citizens without reference to religion are not invalid merely because sectarian institutions may also receive an attenuated financial benefit); *Witters*, 474 U.S. at 486, 106 S.Ct. at 751, 88 L.Ed.2d at 854 ("It is well settled that the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution").

**{¶ 16}** In *Zobrest*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1, the court upheld the constitutionality of a state program that provided a sign-language

interpreter for a deaf student attending a sectarian school. The court stated that the reasoning of *Mueller v. Allen* (1983), 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721, and *Witters*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846, where Establishment Clause challenges were rejected, applied to *Zobrest* because the service at issue "is a general government program that distributes benefits neutrally * * * without regard to the 'sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends." *Zobrest*, 509 U.S. at 10, 113 S.Ct. at 2467, 125 L.Ed.2d at 11, quoting *Witters*, 474 U.S. at 487, 106 S.Ct. at 752, 88 L.Ed.2d at 855. The School Voucher Program meets this standard. It is a general program, even if targeted solely at the Cleveland City School District, and its benefits are available irrespective of the type of alternative school the eligible students attend.

{¶ 17} Whatever link between government and religion is created by the School Voucher Program is indirect, depending only on the "genuinely independent and private choices" of individual parents, who act for themselves and their children, not for the government. *Witters*, 474 U.S. at 487, 106 S.Ct. at 752, 88 L.Ed.2d at 854. To the extent that children are indoctrinated by sectarian schools receiving tuition dollars that flow from the School Voucher Program, it is not the result of direct government action. Cf. *Rosenberger v. Rector & Visitors of Univ. of Virginia* (1995), 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700. Direct government subsidies to a religious school are clearly unconstitutional. *Witters,* 474 U.S. at 487, 106 S.Ct. at 751, 88 L.Ed.2d at 854. We conclude that the School Voucher Program does not create an unconstitutional link between government and religion.

{¶ 18} No other aspect of the statutory scheme involves the government in indoctrination. It is difficult to see how the School Voucher Program could result in governmental indoctrination. No governmental actor is involved in religious activity, no governmental actor works at a religious setting, and no government-provided incentive encourages students to attend sectarian schools. We conclude

that the School Voucher Program does not involve the state in religious indoctrination.

{¶ 19} Next we consider whether the School Voucher Program defines its recipients by reference to religion. There are two specific references to religion in the statutory scheme. They are directed to ensuring that registered private schools do not discriminate on the basis of religion or teach hatred on the basis of religion. R.C. 3313.976(A)(4) and (A)(6). On its face, the statutory scheme does not define its recipients by reference to religion. That does not end our inquiry, however. We must also determine whether the statutory scheme has "the effect of advancing religion by creating a financial incentive to undertake religious indoctrination." *Agostini*, 521 U.S. at 231, 117 S.Ct. at 2014, 138 L.Ed.2d at 419.

{¶ 20} Most of the beneficiaries of the School Voucher Plan attend sectarian schools. That circumstance alone does not render the School Voucher Program unconstitutional if the scholarships are "allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and [are] made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Agostini*, 521 U.S. at 231, 117 S.Ct. at 2014, 138 L.Ed.2d at 419. See *Mueller*, 463 U.S. at 401, 103 S.Ct. at 3070, 77 L.Ed.2d at 732 ("We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law"). We conclude that the selection criteria of the School Voucher Program do not all satisfy this standard.

{¶ 21} The School Voucher Program provides scholarships to students to enable them to attend certain schools other than the public school in the district in which they reside. Registered private schools admit students according to the following priorities: (1) students enrolled in the previous year, (2) siblings of students enrolled in the previous year, (3) students residing within the school district in which the private school is located by lot, (4) students whose parents are

affiliated with any organization that provides financial support to the school, and (5) all other applicants by lot. R.C. 3313.977(A). We conclude that priorities (1), (2), (3), and (5) are neutral and secular and that priority (4) is not.

{¶ 22} Under priority (4), a student whose parents belong to a religious group that supports a sectarian school is given priority over other students not admitted according to priorities (1), (2), and (3). Priority (4) provides an incentive for parents desperate to get their child out of the Cleveland City School District to "modify their religious beliefs or practices" in order to enhance their opportunity to receive a School Voucher Program scholarship. *Agostini*, 521 U.S. at 232, 117 S.Ct. at 2014, 138 L.Ed.2d at 420. That a student whose parents work for a company that supports a nonsectarian school would also have priority over students not admitted according to priorities (1), (2), and (3) does not negate the incentive to modify religious beliefs or practices. We conclude that priority (4) favors religion and therefore hold that R.C. 3313.977(A)(1)(d) is unconstitutional. No other part of the statutory scheme defines the School Voucher Program's recipients by reference to religion.

{¶ 23} Next we must determine whether R.C. 3313.977(A)(1)(d) can be severed from the rest of the statutory scheme. "The test for determining whether part of a statute is severable was set forth in *Geiger v. Geiger* * * *:

" '(1)  Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself?  (2)  Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out?  (3)  Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?' "  *State v. Hochhausler* (1996), 76 Ohio St.3d 455, 464, 668 N.E.2d 457, 466-467, quoting *Geiger v. Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28, 33.

{¶ 24} The removal of R.C. 3313.977(A)(1)(d) does not render the remainder of the statutory scheme incapable of standing on its own. *Id.* The removal of R.C. 3313.977(A)(1)(d) does not "make it impossible to give effect to the apparent intention" of the General Assembly. *Id.* The removal of R.C. 3313.977(A)(1)(d) does not necessitate the insertion of words to "separate the constitutional part from the unconstitutional part." *Id.* R.C. 3313.977(A)(1)(d) is severable, and we sever it from the remainder of the statutory scheme.

{¶ 25} Next we examine whether the School Voucher Program has the effect of advancing religion by excessively entangling church and state. See *Agostini*, 521 U.S. at 233, 117 S.Ct. at 2015, 138 L.Ed.2d at 420 ("Entanglement must be excessive before it runs afoul of the Establishment Clause"). In making this determination, we must consider " 'the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.' " *Id.* at 232, 117 S.Ct. at 2015, 138 L.Ed.2d at 420, quoting *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112, 29 L.Ed.2d at 757.

{¶ 26} The primary beneficiaries of the School Voucher Program are children, not sectarian schools. *Zobrest*, 509 U.S. at 12, 113 S.Ct. at 2469, 125 L.Ed.2d at 13. For purposes of Establishment Clause analysis, the institutions that are benefited are nonpublic sectarian schools. However, the nonpublic sectarian schools that admit students who receive scholarships from the School Voucher Program do not receive the scholarship money directly from the state. The aid provided by the state is received from the parents and students who make independent decisions to participate in the School Voucher Program and independent decisions as to which registered nonpublic school to attend. See *Witters*, 474 U.S. at 488, 106 S.Ct. at 752, 88 L.Ed.2d at 855. Given the indirect nature of the aid, the resulting relationship between the nonpublic sectarian schools

and the state is attenuated. *Zobrest*, 509 U.S. at 8, 113 S.Ct. at 2466, 125 L.Ed.2d at 10.

{¶ 27} To be sure, a sectarian school must register with the state before enrolled students may avail themselves of the benefits of the School Voucher Program to attend that school. R.C. 3313.976. However, these requirements are not onerous, and failure to comply is punished by no more than a revocation of the school's registration in the School Voucher Program. *Id.* We do not see how this relationship (which is, at least in part, preexisting, because sectarian schools are already subject to certain state standards, see R.C. 3301.07; Ohio Adm.Code Chapter 3301-35) has the effect of excessively entangling church and state. In sum, there is no credible evidence in the record that the *primary* effect of the School Voucher Program is to advance religion.

{¶ 28} We conclude that the School Voucher Program has a secular legislative purpose, does not have the primary effect of advancing religion, and does not excessively entangle government with religion. Accordingly, we hold that the School Voucher Program does not violate the Establishment Clause of the First Amendment to the United States Constitution. We hold that R.C. 3313.977(A)(1)(d) does violate the Establishment Clause and sever it from the remainder of the statutory scheme.

II

{¶ 29} Section 7, Article I of the Ohio Constitution states that "[n]o person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted." For purposes of the case before us, this section is the approximate equivalent of the Establishment Clause of the First Amendment to the United States Constitution. See *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 8, 15 O.O.3d 3, 4, 399 N.E.2d 66, 67; *S. Ridge Baptist Church v. Indus. Comm.* (S.D.Ohio

1987), 676 F.Supp. 799, 808. This court has had little cause to examine the Establishment Clause of our own Constitution and has never enunciated a standard for determining whether a statute violates it. See *Protestants & Other Americans United for Separation of Church & State v. Essex* (1971), 28 Ohio St.2d 79, 57 O.O.2d 263, 275 N.E.2d 603 (federal Establishment Clause jurisprudence discussed; Section 7, Article I of the Ohio Constitution applied but not discussed). Today we do so by adopting the elements of the three-part *Lemon* test. We do this not because it is the federal constitutional standard, but rather because the elements of the *Lemon* test are a logical and reasonable method by which to determine whether a statutory scheme establishes religion.

{¶ 30} There is no reason to conclude that the Religion Clauses of the Ohio Constitution are coextensive with those in the United States Constitution, though they have at times been discussed in tandem. See *Pater v. Pater* (1992), 63 Ohio St.3d 393, 588 N.E.2d 794; *In re Milton* (1987), 29 Ohio St.3d 20, 29 OBR 373, 505 N.E.2d 255. The language of the Ohio provisions is quite different from the federal language. Accordingly, although we will not on this day look beyond the *Lemon-Agostini* framework, neither will we irreversibly tie ourselves to it. See *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 42, 616 N.E.2d 163, 169 (Ohio Constitution is a document of independent force). We reserve the right to adopt a different constitutional standard pursuant to the Ohio Constitution, whether because the federal constitutional standard changes or for any other relevant reason.

{¶ 31} We reiterate the reasoning discussed during our analysis of the federal constitutional standard, and although we now analyze pursuant to the Ohio Constitution, we not surprisingly reach the same conclusion. See *Michigan v. Long* (1983), 463 U.S. 1032, 1040-1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214. We conclude that the School Voucher Program does not have an impermissible legislative purpose or effect and does not excessively entangle the state and

14

religion.  The School Voucher Program does not violate Section 7, Article I of the Ohio Constitution.

**{¶ 32}** Section 2, Article VI of the Ohio Constitution states that "no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this state."  While this clause has seldom been discussed by this court, we did state in *Protestants & Other Americans United for Separation of Church & State*, 28 Ohio St.2d at 88, 57 O.O.2d at 268, 275 N.E.2d at 608, that "the sole fact that some private schools receive an indirect benefit from general programs supported at public expense does not mean that such schools have an exclusive right to, or control of, any part of the school funds of this state."  As discussed previously, no money flows directly from the state to a sectarian school and no money can reach a sectarian school based solely on its efforts or the efforts of the state.  Sectarian schools receive money that originated in the School Voucher Program only as the result of independent decisions of parents and students.  Accordingly, we conclude that the School Voucher Program does not result in a sectarian school having an "exclusive right to, or control of, any part of the school funds of this state."  The School Voucher Program does not violate this clause of Section 2, Article VI of the Ohio Constitution.

**{¶ 33}** Section 2, Article VI of the Ohio Constitution also states that "[t]he general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State."  In *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733, this court held that the state has an obligation to establish a "thorough and efficient system of common schools."  It can be argued that implicit within this obligation is a prohibition against the establishment of a system of uncommon (or nonpublic) schools financed by the state.

**{¶ 34}** Private schools have existed in this state since before the establishment of public schools.  They have in the past provided and continue to

provide a valuable alternative to the public system. However, their success should not come at the expense of our public education system or our public school teachers. We fail to see how the School Voucher Program, at the current funding level, undermines the state's obligation to public education.[2] The School Voucher Program does not violate this clause of Section 2, Article VI of the Ohio Constitution.

III

**{¶ 35}** Section 26, Article II of the Ohio Constitution, the Uniformity Clause, states that "[a]ll laws of a general nature, shall have a uniform operation throughout the State * * *." To determine whether the School Voucher Program violates the Uniformity Clause, we must ascertain "(1) whether the statute is a law of a general or special nature, and (2) whether the statute operates uniformly throughout the state." *Desenco, Inc. v. Akron* (1999), 84 Ohio St.3d 535, 541, 706 N.E.2d 323, 330.

**{¶ 36}** A subject is general " 'if the subject does or may exist in, and affect the people of, every county, in the state.' " *Id.* at 542, 706 N.E.2d at 330, quoting *Hixson v. Burson* (1896), 54 Ohio St. 470, 481, 43 N.E. 1000, 1002. The parties agree that schools are a subject of general nature. Further, that is the law of this state. See *State ex rel. Wirsch v. Spellmire* (1902), 67 Ohio St. 77, 65 N.E. 619, paragraph two of the syllabus ("The subject-matter of schools * * * is of a general nature"). Because the School Voucher Program is of a general nature, the Uniformity Clause applies.

**{¶ 37}** We therefore must determine whether the School Voucher Program operates uniformly throughout the state. The General Assembly amended R.C. 3313.975(A), effective June 30, 1997. Former R.C. 3313.975(A) stated that the

---

2. It is possible that a greatly expanded School Voucher Program or similar program could damage public education. Such a program could be subject to a renewed constitutional challenge.

School Voucher Program was limited to "one school district that, as of March 1995, was under a federal court order requiring supervision and operational management of the district by the state superintendent." (146 Ohio Laws, Part I, 1183.) We agree with the court of appeals and find that former R.C. 3313.975(A) violates the Uniformity Clause because it can only apply to one school district.

{¶ 38} For purposes of judicial economy, we will also rule on the constitutionality of the current R.C. 3313.975(A), as amended on June 30, 1997. R.C. 3313.975(A) now reads that the School Voucher Program is limited to "school districts that are or have ever been under a federal court order requiring supervision and operational management of the district by the state superintendent." It is clear that the current School Voucher Program does not apply to the vast majority of the school districts in the state. At the time this case was filed, the School Voucher Program was in effect only within the Cleveland City School District. However, that does not mean that the School Voucher Program cannot satisfy the Uniformity Clause.

{¶ 39} In *State ex rel. Stanton v. Powell* (1924), 109 Ohio St. 383, 385, 142 N.E. 401, this court stated: "Section 26, Art. II of the Constitution [the Uniformity Clause] was not intended to render invalid every law which does not operate upon all persons, property or political subdivisions within the state. It is sufficient if a law operates upon every person included within its operative provisions, provided such operative provisions are not arbitrarily and unnecessarily restricted. And the law is equally valid if it contains provisions which permit it to operate upon every locality where certain specified conditions prevail. A law operates as an unreasonable classification where it seeks to create artificial distinctions where no real distinction exists." This court has also stated that "a statute is deemed to be uniform despite applying to only one case so long as its terms are uniform and it may apply to cases similarly situated in the future." *State ex rel. Zupancic v. Limbach* (1991), 58 Ohio St.3d 130, 138, 568 N.E.2d 1206, 1213.

**{¶ 40}** The General Assembly amended R.C. 3313.975(A) after the court of appeals below determined that former R.C. 3313.975(A) violated the Uniformity Clause. In amending this statute, the General Assembly was likely guided by our *Zupancic* decision. In *Zupancic*, we held that a statute that differentiated between taxing districts based on whether they contained electric power plants having initial production equipment costs in excess of $1 billion did not violate the Uniformity Clause, even though at the time the statute was enacted only one electric power plant had production equipment whose initial cost exceeded $1 billion. The court reasoned that "[a]lthough the statute may presently apply to one particular electric power plant with an initial cost exceeding $1 billion, there is nothing within the Act itself to prevent its prospective operation upon any electric power plant similarly situated throughout the state." *Zupancic*, 58 Ohio St.3d at 138, 568 N.E.2d at 1213.

**{¶ 41}** The same is true in this case. The Cleveland City School District is the only school district that is currently eligible for the School Voucher Program. However, the statutory limitation, as amended, does not prohibit similarly situated school districts from inclusion in the School Voucher Program in the future. R.C. 3313.975(A).

**{¶ 42}** The General Assembly had a rational basis for enacting the School Voucher Program, which relates to a statewide interest, and for specifically targeting the Cleveland City School District, which is the largest in the state and arguably the one most in need of state assistance.[3] Further, the School Voucher Program is a pilot program, which suggests that the General Assembly is experimenting to determine whether the voucher concept is beneficial or worthy of further implementation. Though the School Voucher Program is currently limited

---

3. Our conclusion might be different if a program benefited only the district of a particularly powerful legislator.

to one school district, we conclude that the General Assembly did not arbitrarily or unnecessarily restrict the operative provisions of the program.

{¶ 43} The distinction between districts that satisfy the conditions and those that do not is not artificial. It is clear from the record that the Cleveland City School District is in a crisis related to the supervision order. The General Assembly took extraordinary measures to attempt to alleviate an extraordinary situation. That other school districts also have significant problems does not mean the distinction between school districts under state supervision by order of a federal court and other school districts is not real. The distinction is at least as real as the distinction between electric power plants with initial production equipment costs exceeding $1 billion and those with initial production equipment costs of less that $1 billion. See *Zupancic*.

{¶ 44} We conclude that the School Voucher Program operates uniformly throughout the state because it operates upon every person included within its operative provisions and those operative provisions are not arbitrarily or unnecessarily restrictive.

{¶ 45} The School Voucher Program, although extremely limited in its current application, is a law of a general nature and operates uniformly throughout the state. Accordingly, it does not violate the Uniformity Clause.

IV

{¶ 46} Section 15(D), Article II of the Ohio Constitution states that "[n]o bill shall contain more than one subject, which shall be clearly expressed in its title." This court has stated that the one-subject rule "is merely directory in nature." *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153, syllabus. However, the court elaborated by stating that "when there is an absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or legitimate reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical reasons, *i.e.*, logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purposes of the rule." *Id.* at 145, 11 OBR at 440, 464 N.E.2d at 157. See *Hoover v. Franklin Cty. Bd. of Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580. The court reiterated this standard when it stated, "In order to find a legislative enactment violative of the one-subject rule, a court must determine that various topics contained therein lack a common purpose or relationship so that there is no discernible practical, rational or legitimate reason for combining the provisions in one Act." *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 507.

{¶ 47} The first provision of Am.Sub.H.B. No. 117, as enacted, R.C. 3.15, concerns the residency of certain elected officials. Baldwin's Ohio Legislative Service (1995) L-622.[4] The second provision, R.C. 9.06, which enables certain government entities to contract for the private operation of correctional facilities, is not related to the first provision. 146 Ohio Laws, Part I, 906. The third provision, R.C. 101.34, which declares some files of the joint legislative ethics committee to

---

4. Due to a printing error, the amendment to R.C. 3.15 does not appear in 146 Ohio Laws, Part I, 905, which repeats page 904.

be confidential, is not related to either of the first two provisions. *Id.* at 911. The fourth provision, R.C. 102.02, which requires candidates for elective office to file financial statements with the Ethics Commission, is not related to any of the first three provisions. *Id.* at 913. The fifth provision, R.C. 103.31, which creates a joint legislative committee on federal funds, and the sixth provision, R.C. 103.32, which requires certain state agencies to submit proposals to that committee, are not related to any of the first four provisions. *Id.* at 920-921. It is obvious that none of the first six provisions of Am.Sub.H.B. No. 117 has anything to do with the School Voucher Program. Am.Sub.H.B. No. 117 contains many other examples of topics that "lack a common purpose or relationship."[5] Am.Sub.H.B. No. 117 contained three hundred eighty-three amendments in twenty-five different titles of the Revised Code, ten amendments to renumber, and eighty-one new sections in sixteen different titles of the Revised Code. Baldwin's Ohio Legislative Service (1995) L-621-622.

{¶ 48} There is considerable disunity in subject matter between the School Voucher Program and the vast majority of the provisions of Am.Sub.H.B. No. 117. Cf. *State ex rel. Ohio AFL-CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 229, 631 N.E.2d 582, 586; *Beagle*, 78 Ohio St.3d at 62, 676 N.E.2d at 507. Given the disunity, we are convinced that the General Assembly's consideration of the one-subject rule was based on this court's pre-*Dix* holdings, virtually total deference to the General Assembly. See *Pim v. Nicholson* (1856), 6 Ohio St. 176; *State ex rel. Atty. Gen. v. Covington* (1876), 29 Ohio St. 102, paragraph seven of the syllabus. Despite the "directory" language of *Dix*, the recent decisions of this court make it

---

5. For example, R.C. 3721.011 addresses skilled nursing care. 146 Ohio Laws, Part I, 1329-1333. R.C. 3721.012 addresses risk agreements between residential care facilities and residents of residential care facilities. *Id.* at 1333. R.C. 3721.02 addresses the inspection of nursing homes. *Id.* at 1334. R.C. 3721.04 requires the public health council to adopt rules governing the operation of nursing homes. *Id.* at 1335. R.C. 3721.05 requires operators of nursing homes to obtain a license. *Id.* at 1336.

clear that we no longer view the one-subject rule as toothless. *Hoover; State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 580 N.E.2d 767; *Ohio AFL-CIO*. The one-subject rule is part of our Constitution and therefore must be enforced.[6]

{¶ 49} We recognize that appropriations bills, like Am.Sub.H.B. No. 117, are different from other Acts of the General Assembly. Appropriations bills, of necessity, encompass many items, all bound by the thread of appropriations. Accordingly, even though many of the provisions in Am.Sub.H.B. No. 117 appear unrelated, we will restrict our analysis to the School Voucher Program, the only part of H.B. No. 117 whose constitutionality is challenged in the case before us.

{¶ 50} The School Voucher Program allows parents and students to receive funds from the state and expend them on education at nonpublic schools, including sectarian schools. It is a significant, substantive program. Nevertheless, the School Voucher Program was created in a general appropriations bill consisting of over one thousand pages, of which it comprised only ten pages. See 146 Ohio Laws, Part I, 898-1970. The School Voucher Program, which is leading-edge legislation, was in essence little more than a rider attached to an appropriations bill. Riders are provisions that are included in a bill that is " 'so certain of adoption that the rider will secure adoption not on its own merits, but on [the merits of] the measure to which it is attached.' " *Dix*, 11 Ohio St.3d at 143, 11 OBR at 438, 464 N.E.2d at 156, quoting Ruud, "No Law Shall Embrace More Than One Subject" (1958), 42

---

6. In dissent, Judge Baird relies heavily on *Pim v. Nicholson* (1856), 6 Ohio St. 176. *Pim* was the controlling authority on this subject through this court's decision in *Dix*, 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153. However, at this time, it is clearly established that bills enacted by the General Assembly may be challenged "on the basis that the original bill contained more than one subject in violation of Section 15(D), Article II of the Ohio Constitution." *Hoover*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580. In *Hoover*, this court went on to state that "the court of appeals held that no enactment may be attacked on this basis, as the 'one-subject' provision of Section 15(D) has been consistently viewed as merely directory rather than mandatory. We disagree and reverse." *Id.* Today, we adhere to the holdings of *Dix* and its progeny, rather than *return* to the one-hundred-forty-three-year old *Pim*.

Minn.L.Rev. 389, 391. Riders were one of the problems the *Dix* court was concerned about. *Id.* The danger of riders is particularly evident when a bill as important and likely of passage as an appropriations bill is at issue. See Ruud at 413 ("[T]he general appropriation bill presents a special temptation for the attachment of riders. It is a necessary and often popular bill which is certain of passage").

{¶ 51} Another significant aspect of the one-subject rule, according to the *Dix* court, is that "[b]y limiting each bill to one subject, the issues presented can be better grasped and more intelligently discussed." *Dix*, 11 Ohio St.3d at 143, 11 OBR at 438, 464 N.E.2d at 156. This principle is particularly relevant when the subject matter is inherently controversial and of significant constitutional importance.

{¶ 52} This court has stated that "[t]he mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics. However, where there is a blatant disunity between topics and no rational reason for their combination can be discerned, it may be inferred that the bill is the result of logrolling * * *." *Hoover*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580. As discussed previously, there is a "blatant disunity between" the School Voucher Program and most other items contained in Am.Sub.H.B. No. 117. Further, we have been given "no rational reason for their combination," which strongly suggests that the inclusion of the School Voucher Program within Am.Sub.H.B. No. 117 was for tactical reasons. *Dix*, 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157.

{¶ 53} Given the factors discussed above, we conclude that creation of a substantive program in a general appropriations bill violates the one-subject rule. Accordingly, the School Voucher Program must be stricken from Am.Sub.H.B. No. 117. See *Ohio AFL-CIO*, 69 Ohio St.3d at 247, 631 N.E.2d at 598-599 (Pfeifer, J., concurring); *Hinkle*, 62 Ohio St.3d at 147-149, 580 N.E.2d at 769-770.

**{¶ 54}** Our holding does not overrule *Dix;* indeed we have relied on its reasoning extensively. Instead, we modify *Dix* to the extent necessary to ensure that it is not read to support the position that a substantive program created in an appropriations bill is immune from a one-subject-rule challenge as long as funds are also appropriated for that program.

**{¶ 55}** In order to avoid disrupting a nearly completed school year, our holding is stayed through the end of the current fiscal year, June 30, 1999.

*Judgment affirmed in part*

*and reversed in part.*

MOYER, C.J., concurs.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur in judgment only.

BAIRD and W. YOUNG, JJ., concur in part and dissent in part.

WILLIAM R. BAIRD, J., of the Ninth Appellate District, sitting for COOK, J.

WILLIAM W. YOUNG, J., of the Twelfth Appellate District, sitting for LUNDBERG STRATTON, J.

_____

**DOUGLAS, J., concurring in judgment only.**

**{¶ 56}** I concur that the School Voucher Program, as enacted by the General Assembly, violates the one-subject rule, Section 15(D), Article II of the Ohio Constitution. With regard to the rest of the majority opinion, while there is much I agree with, I find a number of the other assertions by the majority to be advisory in nature and, accordingly, while I concur, I do so only in the judgment.

**{¶ 57}** I also write separately to address the dissent. I do so with regard to four matters.

**{¶ 58}** I recognize that the majority opinion discusses the dissent in footnote 6. I believe that more needs to be said regarding the reliance by the dissenters on *Pim v. Nicholson* (1856), 6 Ohio St. 176. For whatever reason, the dissenters fail to quote from *Pim* that court's reasoning for holding as it did. *Pim* also says that

24

"[w]e are therefore of the opinion, that in general the only safeguard against the violation of these rules [the one-subject rule] of the houses, is their regard for, and their oath to support the constitution of the state. We say in general the only safeguard: for whether a manifestly gross and fraudulent violation of these rules might authorize the court to pronounce a law unconstitutional, it is unnecessary to determine. *It is to be presumed that no such case will ever occur."* (Emphasis added.) *Id.* at 181. Thus, the *Pim* court, in the year 1856, found it unnecessary to determine, in that case, whether a violation of the one-subject rule did or would ever occur, and the court operated on the presumption that such a violation would never occur. It is, however, now apparent that a number of violations of the one-subject rule have occurred, and we have had brought to us a number of cases, like the case now before us, complaining of the persistent violation of the rule. Even the dissenters herein tacitly acknowledge this by adroitly avoiding any real discussion of the issue. Given such pronouncements as are contained in Appendix A, attached **[Appendix A is not included in the Internet version of this case]**, we have a constitutional duty to no longer ignore the practice.

**{¶ 59}** The dissenters also say that the majority "has concluded that the School Voucher Program is unconstitutional *merely* because Am.Sub.H.B. No. 117 contained unrelated subjects." (Emphasis added.) "Merely" is defined as "[w]ithout including anything else; purely; only; solely; *absolutely; wholly."* (Emphasis added.) Black's Law Dictionary (6 Ed.1990) 988. Here the dissenters are correct. The School Voucher Program absolutely (merely) does violate the Constitution and our oaths require us to say so when that is the fact.

**{¶ 60}** Further, the dissenters say that "[t]his court recently observed the distinction between 'directory' and 'mandatory,' and refused to render void a judicial decision made in violation of a procedural *statutory* provision it deemed directory. *In re Davis* (1999), 84 Ohio St.3d 520, 705 N.E.2d 1219. The *statute* at issue required a juvenile court to enter judgment within seven days of a

dispositional hearing." (Emphasis added.) We, of course, in the case now before us are not deciding a *statutory* issue. We are called upon, herein, to interpret a clear, unambiguous and absolute provision of our *Ohio Constitution,* to wit, "[n]o bill shall contain more than one subject, which shall be clearly expressed in its title." The difference should be obvious. Need we be reminded that it was Chief Justice John Marshall, as early as March 7, 1819, who explained for all of us who would follow that "[i]n considering this question, then, we must never forget that it is a *constitution* we are expounding"? (Emphasis *sic.*) *McCulloch v. Maryland* (1819), 4 Wheat. 316, 17 U.S. 316, 407, 4 L.Ed. 579, 601.

{¶ 61} Finally, the dissenters, in perhaps the most disturbing part of the dissent, say that "[t]he salutary effect of [judicial refusal to intervene] is the disentanglement of the courts from the procedural business of the legislature, reserving to the citizens the oversight of the legislature without unnecessary judicial intrusion." Should that proposition be accepted by a majority of this court, then the message would go forth to all of the judges of this state that they should become disentangled from the "business" of the legislature. In one fell swoop we would be turning our backs on *Marbury v. Madison* (1803), 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60, decades and decades of cases following the doctrine of judicial review and, even, Alexander Hamilton's reply to Brutus (Robert Yates) in Federalist, No. 78.

{¶ 62} Fulfilling our obligations as a court does not give us any practical or real omnipotence. We are simply meeting the obligations and exercising the power mandated and conferred by the United States and Ohio Constitutions and sustaining the principle of separation of powers. We must always remember that the power of the people expressed through our Constitutions is superior to the authority of both the legislative and judicial branches of government. While some might call exercise of duty "intrusion," others would define it as "commitment." I ascribe to the latter.

{¶ 63} Accordingly, I concur in the judgment of the majority.

RESNICK and F.E. SWEENEY, JJ., concur in the foregoing opinion.

_____

**BAIRD, J., concurring in part and dissenting in part.**

{¶ 64} I respectfully dissent from that portion of the majority opinion that determines that the School Voucher Program must be stricken from Am.Sub.H.B. No. 117 because it violates the one-subject rule.

{¶ 65} The one-subject rule "was incorporated into the constitution, for the purpose of making it a permanent rule of the houses, and to operate only upon bills in their progress through the general assembly. It is directory only, and the supervision of its observance must be left to the general assembly." *Pim v. Nicholson* (1856), 6 Ohio St. 176, paragraph one of the syllabus. The one-subject rule is not applicable to Acts. *Id*. at 180. It "was imposed to facilitate orderly legislative procedure, *not* to hamper or impede it." (Emphasis *sic*.) *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 143, 11 OBR 436, 438, 464 N.E.2d 153, 156.

{¶ 66} The majority acknowledges that the one-subject rule is directory but not mandatory but deviates from nearly one hundred fifty years of precedent as to the import of the terms "directory" and "mandatory." A legislative action taken in violation of a mandatory constitutional provision renders the enactment void, while violation of a directory provision does not. See *State ex rel. Atty. Gen. v. Covington* (1876), 29 Ohio St. 102, 117.

{¶ 67} This court recently observed the distinction between "directory" and "mandatory," and refused to render void a judicial decision made in violation of a procedural statutory provision it deemed directory. *In re Davis* (1999), 84 Ohio St.3d 520, 705 N.E.2d 1219. The statute at issue required a juvenile court to enter judgment within seven days of a dispositional hearing. The judgment at issue was entered seventeen months after the hearing. This court determined that the remedy for violation of the directory statute was enforcement of its provisions through a

writ of procedendo, rather than nullification of the order. *Id.* at 523, 705 N.E.2d at 1222.

{¶ 68} Today's majority ruling establishes that the sort of deference accorded by this court to judicial tribunals that fail to follow directory procedural guidelines is not necessarily available to the General Assembly. It has concluded that the School Voucher Program is unconstitutional merely because Am.Sub.H.B. No. 117 contained unrelated subjects. This, according to the majority, "suggests" logrolling by members of the General Assembly, although the record is devoid of any evidence of logrolling. There is no evidence to suggest that senators or representatives were unaware that the School Voucher Program was a part of Am.Sub.H.B. No. 117 when they voted, no evidence that someone surreptitiously attached the School Voucher Program as a rider to the bill on the eve of the vote, and no evidence of fraud or conspiracy by and among members of the General Assembly relative to passage of the bill or any of its components.

{¶ 69} As a result of today's majority opinion, there are now, in effect, three categories of constitutional provisions governing the General Assembly: "directory," "mandatory," and "directory but void if determined by a court to contain more than one subject." The majority relies on *Dix v. Celeste* to support its reasoning but ignores the *Dix* syllabus law, which requires that a bill be "a manifestly gross and fraudulent violation" of the one-subject rule before it will be invalidated on constitutional grounds. Accord *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 507. The requirement that a bill be a manifestly gross and fraudulent violation of the one-subject rule, when read together with earlier decisions of this court, suggests a two-part inquiry when analyzing whether a bill must be stricken as violative of the one-subject rule. The first step is what the majority today views as the only step: whether the bill contained a "blatant disunity between topics." The second step is whether evidence shows that passage of the bill was "a manifestly gross and fraudulent violation" of the one-subject rule. *Dix*,

11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153, at the syllabus. By eliminating this second step, the majority has apparently concluded that violation of the one-subject rule will be determined solely by the numbers. If two subjects can be discerned, even within the context of an appropriations bill that is by its nature a multi-subject bill, a portion of the bill may be challenged, and proclaimed void, even years after it has been enacted and implemented. Plaintiffs need not plead fraud, with or without particularity, and they need not prove fraud, in order to have a statute stricken. Moreover, because the majority has opted to strike only a portion of Am.Sub.H.B. No. 117, and not the bill itself, multiple litigants can require this court to repeat today's exercise, again and again, until all but one subject remains.

{¶ 70} By today's majority ruling, Ohio's judicial branch of government has intruded on its legislative branch on the basis of an inference of logrolling (in the absence of evidence of logrolling) and has invalidated an otherwise constitutional law on the basis of a technical procedural infraction. At one time, such intrusions by one branch of a government into the business of another were taken only with extreme caution and only to protect great public or private constitutional interests. The United States Supreme Court, for example, was willing to intrude upon the executive branch of the United States government by creation of the exclusionary rule only because, not to do so, would have rendered the Fourth Amendment's protection against illegal searches and seizures to be of no value. *Weeks v. United States* (1914), 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652, 656.

{¶ 71} When this court held in *Dix* that the one-subject rule was "merely directory," it stated that, rather than "disparag[ing] the constitutional provision[,]" it had "simply accorded appropriate respect to the General Assembly, a coordinate branch of the state government." *Dix*, 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157. The salutary effect of such reasoning is the disentanglement of the

courts from the procedural business of the legislature, reserving to the citizens the oversight of the legislature without unnecessary judicial intrusion.

W. YOUNG, J., concurs in the foregoing opinion.

_____