Justice Jim Rice, dissenting.
***495 ¶ 108 I concur in Justice Baker's dissenting opinion, and offer the following further thoughts.
¶ 109 First, this case was pled and litigated as a challenge brought by the Plaintiffs against the Department's enactment of Rule 1. The Plaintiffs gave notice of their challenge, stating "the Department of Revenue's Rule 1 implementing the [Scholarship] program violates Named Plaintiffs' rights under the Montana and U.S. Constitutions" and that "the Department of Revenue's rule is inconsistent with the statutory language and intent." In response, the Attorney General elected not to defend the Rule. No challenge to the constitutionality of § 15-30-3111, MCA, was ever made or noticed and, therefore, the Attorney General was not provided an opportunity to appear and defend its constitutionality. While the State is a party, and therefore, had notice of the proceeding itself, no challenge to the statute was made within the proceeding, and, consequently, the issue was not noticed, briefed, or argued. The Court has raised the constitutionality of the statute sua sponte. Striking a statute under such circumstances, including without notice, briefing or argument, and an opportunity for the parties and Attorney General to argue the issue, is a violation of due process and an inappropriate exercise of the Court's powers.
¶ 110 On the merits of its analysis, the Court's conclusions are largely devoid of supporting authority, and I concur with Justice Baker that the Court is not interpreting the Montana Constitution in accordance with established legal principles. Indeed, the Court's interpretation ignores, for the most part, the plain language of the Constitution and our Constitutional history.
¶ 111 The Court summarily declares that the subject Scholarship Program "aids sectarian schools" in violation of Article X, Section 6, of the Montana Constitution, a conclusion that is factually and legally incorrect. Opinion, ¶¶ 16, 28. First, as the Department acknowledges, the Program is facially neutral, and does not require any benefit to accrue to a particular school, religious or otherwise. The Program is voluntary, funded by charitable donations, and, consistent with its stated legislative purpose to promote school choice, is entirely directed by private action, without government direction, as follows: (1) the charitable donor has a choice, first, whether to donate, and, second, whether to donate to the private or to the public school scholarship program, but may not direct contributions to specific schools; (2) the *632 student and parents/guardians choose the qualifying private institution, whether religious or non-religious, which the student will ***496 attend and to which a scholarship is directed; and (3) the SSO must direct the scholarship to the institution, religious or non-religious, chosen by the student's family, and may not otherwise reserve or restrict scholarships for use at a particular school. Thus, a religiously-affiliated school cannot be designated by the donor, the SSO, or the government-only by students and their families.
¶ 112 Further, the beneficiary of the Program is not the school, but the student/family receiving the scholarship, because they are relieved of a portion of their financial obligation for the student's attendance at a private school. This is separate from the private school itself, which must be paid the same tuition regardless of any assistance from the Program. Other courts have widely recognized this principle. See Simmons-Harris v. Goff , 86 Ohio St.3d 1, 711 N.E.2d 203, 211 (1999) ("The primary beneficiaries of the School Voucher Program are children, not sectarian schools."); Meredith v. Pence , 984 N.E.2d 1213, 1228-29 (Ind. 2013) (scholarship program not violative of no-aid provision because "[t]he direct beneficiaries under the voucher program are the families of eligible students and not the schools selected by the parents for their children to attend"); Kotterman v. Killian , 193 Ariz. 273, 972 P.2d 606, 616 (1999) ("The primary beneficiaries of this credit are taxpayers who contribute to the [SSOs], parents who might otherwise be deprived of an opportunity to make meaningful decisions about their children's educations, and the students themselves.... Private and sectarian schools are at best only incidental beneficiaries of [the] tax credit...."); see also Zelman v. Simmons-Harris , 536 U.S. 639, 649, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002) (distinguishing between "government programs that provide aid directly to religious schools" and scholarship programs based upon "genuine and independent choices of private individuals").
¶ 113 Similar to our acknowledgment in Mont. State Welfare Bd. v. Lutheran Soc. Servs. , 156 Mont. 381, 390, 480 P.2d 181, 186 (1971), of the "purely incidental" benefit that inured to the private adoption agency under the indigent mother's assistance program, Kotterman recognized that programs such as the Scholarship Program can have "ripple effects" that "radiate to infinity," but that these are not constitutionally significant. Kotterman, 972 P.2d at 616. Any benefit of the Scholarship Program flowing from the private donor's voluntary contribution to the SSO, and then, if the student and family so chose, to a qualified religiously-affiliated school, is incidental and attenuated. Indeed, it is even more attenuated than the benefit provided by the government program in Lutheran Soc. Servs. , because the Scholarship Program does not involve money that issues from a government fund. As the U.S. Supreme Court has stated for establishment clause ***497 purposes, "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion" are not invalid merely "because sectarian institutions may also receive an attenuated financial benefit." Zobrest v. Catalina Foothills Sch. Dist. , 509 U.S. 1, 8, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). The Program stands in stark contrast, factually and legally, to the levy imposed upon taxpayers in State ex rel. Chambers v. Sch. Dist. , 155 Mont. 422, 472 P.2d 1013 (1970), as Montana taxpayers have not been implicated in, or made to support, a sectarian or religious activity by way of government extraction and expenditure of tax dollars, or by other coercive means.
¶ 114 Because the scholarships are directed by students and families, and there is no government action endorsing or directing funds for sectarian or religious purposes, there is no significance to the fact that more Program options are currently available for students choosing to attend private religious schools than private non-religious schools. The same was true for the private religious adoption agencies at issue in Lutheran Soc. Servs. Other courts have widely recognized this principle. See Oliver v. Hofmeister , 368 P.3d 1270, 1274 (Okla. 2016) (finding no "constitutional significance" in the fact that there are "more students attending sectarian private schools than non-sectarian" private schools); Simmons-Harris , 711 N.E.2d at 210 (finding the fact that "[m]ost of the beneficiaries" of a neutral school scholarship program *633 "attend sectarian schools" not relevant or persuasive). As stated by the U.S. Supreme Court, the "constitutionality of a neutral education aid program simply does not turn on whether and why, in a particular area, at a particular time, most private schools are run by religious organizations, or most recipients choose to use the aid at a religious school." Zelman , 536 U.S. at 658, 122 S.Ct. at 2470 (discussing a neutral program where 96 percent of voucher recipients were in religious schools ultimately found constitutionally permissible); see also Mueller v. Allen , 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (same). The Program simply creates a neutral opportunity for genuine independent choices of donors and scholarship recipients, and provides that the beneficiaries of the program are the scholarship recipients. See Oliver , 368 P.3d at 1277 (upholding a student scholarship program because it was "completely neutral with regard to religion and that any funds deposited to a sectarian school occur as the sole result of the parent's independent decision completely free from state influence.... The parent, not the State , determines where the scholarship funds will be applied.") (emphasis in original).
¶ 115 Thus, in my view, the Court's conclusion that the Program ***498 "permits the Legislature to indirectly pay" sectarian schools, Opinion, ¶ 32, is not supported by the facts here, and, as Justice Baker's dissenting opinion also illustrates, is not supported by the plain language of the Constitution or the history of the Constitutional Convention. This conclusion follows the Department's troubling argument that the Scholarship Program is a "diversion" of "public funds" by the Legislature. The argument is premised on the Department's theory that the base tax liability each taxpayer will owe to the State on income that the taxpayer will earn should be considered "public funds," and that all tax liability-even potential liability on potential income, before a taxpayer timely completes the tax return process and applies deductions and credits for the entire year-is the property of the State, until such time a proper tax return is filed and the state permits a credit for the year's donations to be made against the taxpayer's liability. The Department's view, that " '[t]ax expenditures' are monetary subsidies the government bestows on particular individuals or organizations by granting them preferential tax treatment ... the various deductions, credits and loopholes [ ] are just spending by another name,"[1] might be correct for purposes of internal state government budgeting, § 5-4-104, MCA, but it is an utter misstatement of the fundamental right of private property ownership. A citizen's income-all income of each year, every year-belongs to the citizen until such time the proper portion thereof becomes owed to the government; the government does not own all income until the citizen demonstrates otherwise. At the time a citizen donates to the Scholarship Program, the tax year has not ended, the donor's total income may not have been earned, the tax return process has not been timely initiated, and the donor's potential tax liability is unknown. The government cannot at that time "own" the unknown tax liability as a public fund, or even an asset, regardless of whether the tax credit is "dollar-for-dollar" or otherwise, and regardless of the previous year's tax law. "[U]nder such reasoning all taxpayer income could be viewed as belonging to the state because it is subject to taxation by the legislature." Kotterman , 972 P.2d at 618 ; accord Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 144, 131 S.Ct. 1436, 1448, 179 L.Ed.2d 523 (2011) ("Private bank accounts cannot be equated with the [ ] state treasury.").
¶ 116 A study of history reminds us that governments have oppressed or discriminated against citizens based upon their religious ***499 faith over millennia. Today, courts are to ensure that the citizen's free exercise of religion is not violated by the government. As the U.S. Supreme Court has stated in a recent religious rights case, "all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *634 Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n , --- U.S. ----, 138 S.Ct. 1719, 1731, 201 L.Ed.2d 35 (2018). I thus disagree with the Court's determination that it need not entertain the Plaintiffs' pled free exercise claims because "this is not one of those cases." Opinion, ¶ 40.

Big Sky Scholarships, About this Charity , https://perma.cc/5TMP-M4XD. As Big Sky Scholarships also points out, "The entire amount of any donation is eligible for the federal charitable deduction." Thus, a taxpayer "donor" would not only reduce his or her Montana tax liability by up to $150, but he or she could also take a charitable deduction for that amount on his or her federal income tax return. Therefore, a taxpayer in the 33% tax bracket would receive a $49.50 reduction in his or her federal income tax liability on top of the dollar-for-dollar tax credit on the taxpayer's State taxes.

We note, however, that the Legislature created a similar tax credit for public schools that explicitly creates an appropriation. Such "donations for the purpose of funding innovative educational programs" entitles contributors to tax credits consistent with § 15-30-3110, MCA. These funds are deposited into a "state special revenue fund" and are then appropriated to public schools. Section 20-9-905, MCA.

SB410's fiscal note indicates the Tax Credit Program will reduce general fund revenues by up to $9.6 million per year by 2022 because § 15-30-3111(5), MCA, provides for the available tax credits to increase by ten percent following each year that the previous tax year's credit limit is met.

An assignment is the transfer of rights or property. Assignment, Black's Law Dictionary (10th ed. 2014). See also Assignee, Black's Law Dictionary (10th ed. 2014) ("One to whom property rights or powers are transferred by another.").

Section 15-30-3101, MCA, provides in part: "Pursuant to 5-4-104, the legislature finds that the purpose of student scholarship organizations is to provide parental and student choice in education with private contributions through tax replacement programs." Section 5-4-104(1), MCA, provides in part that "the legislature encourages a policy of providing an explicit purpose of a tax expenditure...." Therefore, the Legislature clearly recognized that the TCQEC creates a tax expenditure.

Big Sky Scholarships presently lists 13 QEPs, only one of which, an elementary school for children with learning disabilities, is secular. Big Sky Scholarships, Schools , https://perma.cc/L8RB-AD69.

In pertinent part, Article V, Section 11(5), prohibits the Legislature from making any appropriation for "religious ... purposes to any private individual, private association, or private corporation not under control of the state." Article X, Section 6, prohibits state and local governments from "mak[ing] any direct or indirect appropriation or payment from any public fund or monies ... for any sectarian purpose or to aid any church [or] school ... controlled in whole or in part by any church, sect, or denomination."

Article XI, Section 8, of the 1889 Constitution, provided:
Neither the Legislative Assembly, nor any county, city, town, or school district, or other public corporations, shall ever make directly or indirectly, any appropriation, or pay from any public fund or moneys whatever, or make any grant of lands or other property in aid of any church, or for any sectarian purpose, or to aid in support of any school, academy, seminary, college, university, or other literary, scientific institution, controlled in whole or in part by any church, sect or denomination whatever.