**Doris SIMMONS–HARRIS, et al., Plaintiffs,**

**v.**

**Dr. Susan Tave ZELMAN, Superintendent of Public Instruction, State of Ohio, et al., Defendants**

**Sue Gatton, et al., Plaintiffs,**

**v.**

**Dr. Susan Tave Zelman, Superintendent of Public Instruction, State of Ohio, et al., Defendants.**

**Nos. 1:99 CV 1740, 1:99 CV 1818.**

United States District Court, N.D. Ohio, Eastern Division.

Aug. 25, 1999.

---

David G. Latanick, Cloppert, Portman, Sauter, Latanick & Foley, Columbus, OH, Raymond V. Vasvari, American Civil Liberties Union of Foundation, Inc., Cleveland, OH, for Plaintiffs.

Roger F. Carroll, Mary Lynn Readey, Office of Attorney General, Educ. Section, Columbus, OH, Karen Lee Lazorishak, Office of Attorney General, Columbus, OH, Edward B. Foley, State Solicitor, Office of Attorney General, Antitrust Section, Columbus, OH, for Defendants.

*ORDER*

OLIVER, District Judge.

### I. *INTRODUCTION*

Currently pending before this court in consolidated actions are motions seeking to preliminarily enjoin the Ohio Pilot Scholarship Program on the ground that it violates the Establishment Clause of the First Amendment to the United States Constitution made applicable to the States by the Fourteenth Amendment to the U.S. Constitution. The Court held a hearing on such motion on August 13, 1999. No testimony was taken. The parties stipulated that the Court should consider the affidavits submitted by each party in support of their position.

Case No. 1:99 CV 1740 was filed on July 20, 1999, by Plaintiffs Doris Simmons–Harris, the parent of a minor child who will be a pupil in the Cleveland City School District in the 1999–2000 school year; Marla Franklin, a teacher in the Lorain City School District; and Steven Behr, pastor of Our Savior/Nuestro Salvador Church in Lorain, Ohio, against Defendant Dr. Susan Tave Zelman, in her official capacity as Superintendent of Public Instruction for the Ohio Department of Education.

Case No: 1:99 CV 1818 was filed on July 29, 1999, by Plaintiffs Sue Gatton, chairperson of Citizens Against Vouchers; Mary Murphy, a teacher in the Cleveland City School District; Michael Debose, a pastor in Cuyahoga County, Ohio; Cheryl Debose and Glenn Altschuld, Ohio taxpayers; and Deidra Pearson, the parent of a child enrolled in the Cleveland City School District against Defendants Dr. Susan Tave Zelman, in her official capacity as Superintendent of Public Instruction for the Ohio Department of Education; the State of Ohio, through its General Assembly, Governor and other agents; and Sandra Berry, in her official capacity as Program Administrator for the Ohio Pilot Scholarship Program.

There are two groups seeking intervention in both cases. The first group consists of parents of students who have been . enrolled, or seek to enroll, in private schools under the Program. That group includes Senel Taylor, parent of a ten-year old child who has attended private school under the Program for the last two years; Johnnietta McGrady, parent of two chil-

dren who seek to attend a private school under the Program; Christine Suma, parent of three children who have attended private school under the Program and one child who is on a waiting list to attend private school under the Program; Arkela Winston, parent of two children who have attended private school under the Program; and Amy Hudock, parent of a child who has attended private school under the Program for the past three years.

The second group of intervenors includes nonpublic schools and parents of students who wish to participate in the Program. That group includes Hanna Perkins School, Ivy Chambers, Carol Lambert, Delories Jones, Our Lady of Peace School, Westpark Lutheran School and Lutheran Memorial Association of Cleveland.

The scholarship program challenged in this action was enacted by the Ohio Legislature on June 29, 1999, as part of the Education Budget Bill. See Ohio Revised Code § 3313.974–3313.979. It is in all respects pertinent to this litigation, the same as the original Pilot Scholarship Program enacted by the Legislature in 1995, which was operative for three successive school years. The 1995 Program was stricken down by the Ohio Supreme Court in *Simmons–Harris v. Goff*, 86 Ohio St.3d 1, 711 N.E.2d 203, 216 (Ohio 1999). The Court held that the Program was enacted in violation of Section 15(D), Article II, of the Ohio Constitution in "that creation of a substantive program in a general appropriations bill violates the one-subject rule" found in that provision. *Id.* at 216. The Ohio Supreme Court also addressed the federal constitutional issue raised in that case, whether the Pilot Program violated the Establishment Clause of the First Amendment. It concluded, contrary to the Ohio Court of Appeals, that it did not.

The 1995 Pilot Program was enacted by the Ohio Legislature to address an educational crisis in the public schools in Cleveland in the wake of a U.S. District Court-ordered takeover by the State of the administration of the Cleveland City School District. The 1999 Program is, as was the 1995 Program, applicable to students residing in the District. The Program has two components, a scholarship program to enable students to attend "alternative schools" ("Scholarship Program" or "Voucher Program") and a tutorial program for children attending the Cleveland Public Schools ("Tutorial Program").

Private schools within the geographic boundaries of the City of Cleveland School District and public schools adjacent to the District are eligible to participate in the Scholarship Program as "alternative schools." In order to do so, private schools must register with the State Superintendent. Recipients are chosen by lot and receive a fixed percentage of the tuition charged the alternative school of their choice, up to $2,500. Students whose family income is not more than 200% of the federally-established poverty level receive 90% of their school tuition; other scholarship recipients whose family income is above this threshold receive 75% of their tuition. Participating students may first enroll in the program as early as when they enter kindergarten and must do so by third grade. Once admitted to the program, they are eligible for scholarships through eighth grade. Disbursement of scholarship money to a private school is accomplished by the State sending a check to the chosen school made payable to the parents of the recipient; thereafter, the parents must endorse the check to the school. The State places no restriction on how the private school may utilize the money. In the event that an adjacent public school is involved, the State would issue a check made payable to the school district.

In the three years prior to the Ohio Supreme Court's holding the 1995 Program unconstitutional, no public schools registered for the Program. None have registered since the enactment of the Program in 1999. For the 1999–2000 school year, 3,801 students will be enrolled in the

Program should an injunction not issue. Sixty percent of these students are from families at or below the poverty level. Fifty-six schools are registered to participate in the Program. The record in the prior litigation revealed that 80% of the schools participating in the 1995 program were sectarian and enrolled 85% of the students receiving scholarships. Some of the schools appear to have a pervasive religious orientation. One school's informational literature contains the statement that "total religious instruction is the major focus of the educational program.... Lessons learned in formal religious classes are purposefully carried over into all subject areas." *See* Complaint in Case No. 1:99 CV 1740, Attachment B. Another provides in its Parent Handbook: "a child needs to hear and learn the word of God constantly, and [t]his can be done only when the entire curriculum and the life of the school is grounded in the word of God and dedicated to the purpose of showing the love of the Savior to a world which without Him, would be lost forever." *Id.*

Tutorial grants may be used to obtain tutorial services for students enrolled in the Cleveland Public Schools. The same number of scholarship and tutorial grants must be awarded in a given year. The eligibility criteria for the scholarship and the tutorial grants are the same. The maximum allowable tutorial grant is $500.

The Plaintiffs in these cases maintain that the Ohio Pilot Program is not distinguishable in any pertinent respect from a New York State assistance program struck down by the United States Supreme Court in *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Defendants contend that because the Ohio Supreme Court previously addressed the issue of the constitutionality of the statute finding it did not violate the Establishment Clause, the doctrine of *res judicata* precludes the Plaintiffs from relitigating this issue. Moreover, they maintain that even if *res judicata* is not appropriate, this

Court should defer in its ruling to the Ohio Supreme Court determination of the issue. They also argue that *Nyquist* does not require the enjoining of the Ohio Program because it differs in significant respects from the Program stricken down in *Nyquist*. Alternatively, Defendants argue that this Court should not follow *Nyquist* even if it were to be found controlling because subsequent Supreme Court cases interpreting the Establishment Clause have undermined its vitality.

For the reasons stated herein, Plaintiffs' Motion for a Preliminary Injunction is granted.

## II. *PRELIMINARY INJUNCTION CRITERIA*

■ The following four factors must be considered and balanced in deciding whether to issue a preliminary injunction: (1) whether the moving party is likely to succeed on the merits; (2) whether the moving party would suffer an irreparable injury if the preliminary injunction is not granted; (3) whether a preliminary injunction would cause substantial harm to others; and (4) whether a preliminary injunction would be in the public interest. *G & V Lounge, Inc. v. Michigan Liquor Control Com'n*, 23 F.3d 1071, 1076 (6th Cir. 1994).

■ The violation of a First Amendment right constitutes irreparable injury. *Id.* at 1078–79. Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1079. While harm to others is also an important criteria, the weight to be given this factor turns not only on the gravity of the harm, but on how the issue of likelihood of success is resolved. The greater the likelihood of success on the merits by Plaintiffs, the less weight should be given this factor. On the other hand, the lesser Plaintiffs' likelihood of success on the merits, the more weight should be given this factor. The Court shall discuss each of the four factors in turn and appropriately bal-

ance them to determine whether a preliminary injunction should issue.

### A. Do Plaintiffs Have a Likelihood of Success on the Merits?

#### 1. Does Res Judicata Preclude the Relitigation of This Constitutional Challenge to the Voucher Program?

Defendants argue that Plaintiffs are not likely to succeed on the merits in this case because they are precluded on *res judicata* grounds from litigating the constitutionality of the 1999 Scholarship Program by the decision of the Ohio Supreme Court in *Simmons-Harris v. Goff*, 86 Ohio St.3d 1, 711 N.E.2d 203 (Ohio 1999), finding that the 1995 Program was not in violation of the Establishment Clause. They also argue in the alternative that even if *res judicata* does not apply, the Ohio Supreme Court opinion is well reasoned, entitled to some deference by this Court, and demonstrates that Plaintiffs are not likely to succeed on the merits in this case. Plaintiffs concede that they would be precluded by the doctrine of collateral estoppel if the decision of the constitutional issue by the Ohio Supreme Court in *Simmons-Harris v. Goff* had been necessary to the Court's decision in that case. They argue such decision was not necessary as the Court struck down the statute on state law grounds, finding the 1995 Program in violation of the one-subject bill. Plaintiffs contend that the Court's decision regarding the First Amendment was dicta, and thus not essential to its holding. Consequently, because the Court's decision rested on an adequate and independent state ground, *see Lambrix v. Singletary*, 520 U.S. 518, 522–24, 117 S.Ct. 1517, 137 L.Ed.2d 771, (1997), Plaintiffs were precluded from seeking an appeal pursuant to 28 U.S.C. § 1257 on the constitutional issue before the Ohio Supreme Court.

In *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 78, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), the Supreme Court held that ordinarily a state court judgment would have the same preclusive effect in federal court as that judgment would have in state courts. This result is required by 28 U.S.C. § 1738 which provides that judgments of a state court "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in such state . . . from which they are taken." The Court also clarified the terminology of preclusion, stating:

> The preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology, attributable to the evolution of preclusion concepts over the years. These effects are referred to collectively by most commentators as the doctrine of "res judicata." (Citations omitted). Res judicata is often analyzed further to consist of two preclusion concepts: "issue preclusion" and "claim preclusion." Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. See Restatement, *supra*, § 27. This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar. See *id.*, Introductory Note before § 24. *Id.* at 77, footnote 1.

The Court further stated that claim preclusion is sometimes simply referred to as *res judicata*, which can be confusing when the "doctrine" of *res judicata* is viewed as encompassing both issue and claim preclusion. In this discussion herein, collateral estoppel will be used to mean issue preclusion and *res judicata* will be used to mean claim preclusion.

 Defendants argue issue and claim preclusion in the alternative. Based on the information before the Court at this time, issue preclusion or collateral estoppel is most applicable. Defendants maintain that this issue was already decided by the

Ohio Supreme Court and cannot be relitigated. Under the holding in *Migra*, the Court must determine this issue under the Ohio law of preclusion. Under Ohio law, a "prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action." *Goodson v. McDonough Power Equipment, Inc.*, 2 Ohio St.3d 193, 443 N.E.2d 978, 985 (Ohio 1983). This is consistent with the Restatement (Second) of Judgments § 27, which states:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

Comment (h) to that Section further explains:

> [i]f issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made. In these circumstances, the interest in providing an opportunity for a considered determination, which if adverse may be the subject of an appeal, outweighs the interest in avoiding the burden of relitigation.

Applying the applicable principles of issue preclusion, this Court finds that doctrine is not likely to serve as a bar to Plaintiffs pursuing their Establishment Clause claims on the merits.

■ The Court assumes, as the Plaintiffs have conceded, that for purposes of this motion, they were parties to the prior litigation and would be bound, assuming all other conditions of the doctrine of collateral estoppel have been met. The Court finds that not all of the other conditions have been met. While the Court finds

that Defendants had a full and fair opportunity to litigate the Establishment Clause issue before the Ohio Supreme Court, having briefed and argued this issue there as well as before the Ohio Court of Appeals, the determination of the Establishment Clause issue was not essential to the judgment in *Simmons-Harris*. Plaintiffs' argument is well–taken that the judgment of the Ohio Supreme Court could be fully supported by the state law ground on which the Ohio Supreme Court relied—that the Legislature passed the law in violation of the one-subject bill. This argument is made more compelling by the fact that Plaintiffs could not seek appeal to the U.S. Supreme Court on the federal constitutional issue. The Supreme Court does not entertain appeals from final judgments which rest on federal and state grounds where the state law ground alone is sufficient to uphold the judgment. Since its decision could have no effect on the judgment, it would be meaningless for the Court to hear such an appeal. For these reasons, the Court finds that collateral estoppel does not serve to preclude Plaintiffs from relitigating their Establishment Clause claim here.

The Court will consider the Ohio Supreme Court's opinion and the extent to which it may serve as persuasive authority for this Court on the Establishment Clause issue in the context of discussing the Establishment Clause issue itself.

2. *Does the Voucher Program Violate the Establishment Clause ?*

The separation of church and state was of prime importance to some of the most influential founders and framers of the U.S. Constitution. This perhaps is the reason why the very First Amendment to the U.S. Constitution addresses freedom of religion. It states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The concerns of the founders and framers were born out of both personal conviction regarding the

evils which could attend state-sponsored religion or government interference with religion and also out of their personal experiences. *See Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *id.* at 28, 67 S.Ct. 504 (Rutledge, J. dissenting). *See also Nyquist,* 413 U.S. at 760, 93 S.Ct. 2955; *Strout v. Albanese,* 178 F.3d 57, 61 (1999) and sources cited therein. Ultimately, this provision was made applicable to the states through the Fourteenth Amendment to the U.S. Constitution. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

As the Supreme Court said in *Committee for Public Education and Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), "cases arising under these clauses [the free exercise and establishment clauses] have presented some of the most perplexing questions to come before this Court." However, as the Court said, "[i]t has never been possible or desirable to enforce a regime of total separation ..." *Id.* at 775, 93 S.Ct. 2955. The Supreme Court has "recognize[d] that sectarian schools perform secular, educational functions as well as religious functions, and that forms of aid may be channeled to the secular without providing direct aid to the sectarian." *Nyquist,* 413 U.S. at 775, 93 S.Ct. 2955. It is now clearly established that not every law which confers a benefit on a religious institution violates the Constitution. Some which confer only "indirect," "remote" or "incidental benefits" have been found to be constitutional. *See, e.g., Everson,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711. Nevertheless, line drawing in actual cases has been difficult.

The Court has approved tax deductions for the costs of bus transportation by students, regardless of whether they attended public or private school, including parochial schools. *Everson,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711. The Court has approved the provision of textbooks at parochial schools when textbooks were not provided to students on the basis of whether they attended public or private school. *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). Until recently, the Court held that public employees could not provide instruction in secular subjects, such as giving remedial and accelerated instruction on the premises of religious institutions. *See, e.g., Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3248, 87 L.Ed.2d 267 (1985); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). However, the Court has recently reversed itself on this issue. *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

The Court has generally held that a government cannot provide for scholarship assistance to students which supports religious instruction or indoctrination. *Nyquist,* 413 U.S. 756, 93 S.Ct. 2955. However, it has approved of scholarship assistance where the aid to students is provided as part of a program made generally available without regard to the public-nonpublic or sectarian-nonsectarian nature of the schools to be benefitted. According to the Court, in such instances, the choice of the scholarship recipient of what school to attend is not affected by the aid given. *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986).

■ In order for legislation providing aid to a religious institution to pass constitutional muster, it must meet a three-part test employed by the Court: ( 1 ) it must reflect a secular legislative purpose; (2) it must have a primary effect that neither advances nor inhibits religion; and (3) it must avoid excessive entanglements with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

■ The question to be determined in this case is whether the aid provided under the Cleveland Pilot Scholarship Program, which is not limited to financing secular

instruction, is constitutional under *Lemon* and the applicable Supreme Court precedents.

### a. *Nyquist*

The Court will now examine *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), in an effort to determine whether it should serve as precedent for this case.

In *Nyquist*, New York created a two-part program to partially defray costs to educating low-income students who attended private schools. *Id.* at 762–67, 93 S.Ct. 2955. The first part of the program provided partial tuition reimbursement grants to the low-income parents whose children attended private schools, including religious schools. The second part gave some limited state income tax relief to parents who did not qualify for reimbursement grants. *Id.* at 764, 93 S.Ct. 2955.

In *Nyquist*, the State of New York established a tuition reimbursement program for parents of children attending elementary or secondary nonpublic schools. The reimbursement was limited to $50 for each grade school child and $100 for each high school child. To qualify for reimbursement for this program, a parent had to have an annual taxable income of less than $5,000. In order to receive payment, a parent was required to submit a verified statement to the Commissioner of Education containing a receipted tuition bill. State reimbursements could not exceed 50% of that amount. *Id.* at 764, 93 S.Ct. 2955.

Approximately 85% of the 2,000 nonpublic schools in New York State were church affiliated. Some of the institutions which could qualify for the program imposed religious restrictions of various types, such as requiring students to attend religious activities and to receive instruction in and obey the theology of the school imposing the restrictions. *Id.* at 767–68, 93 S.Ct. 2955.

The Supreme Court found that the tuition reimbursement program, "designed to allow direct, unrestricted grants of $50 to $100 per child ... as reimbursement to parents in low-income brackets who send their children to nonpublic schools, the bulk of which is concededly sectarian in orientation," to be violative of the Establishment Clause of the First Amendment. *Id.* at 780, 93 S.Ct. 2955. The Court noted that there was no doubt that such grants could not "be given directly to sectarian schools ..." *Id.* The Court further stated, "[i]n the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral and non-ideological purposes, it is clear from our cases that direct aid in whatever form is invalid." *Id.*

The Defendants in *Nyquist* argued that the State of New York's tuition reimbursement program was similar to programs upheld by the Court in *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) and *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). In *Everson*, the Court upheld tax deductions for parents who expended bus fare for children who attended religious schools. The *Allen* Court upheld the furnishing of text books directly to children who attended parochial schools. The Court rejected Defendants' argument that the *Nyquist* program should be upheld because, like *Everson and Allen*, the grants in *Nyquist* went to parents and not to the schools. The Court indicated that this was only one of many factors to be considered in determining whether or not the Establishment Clause was violated. Further, it explained that the programs upheld in *Everson* and *Allen* were significantly different from the nature of the tuition grants involved in the *Nyquist* case.

In *Everson*, the Court found the bus fare program analogous to the provision of services such as police and fire protection, sewage disposal, highways, and sidewalks for parochial schools. 330

U.S., at 17—18, 67 S.Ct., at 512—513. Such services, *782 provided in common to all citizens, are 'so separate and so indisputably marked off from the religious function,' *id.,* at 18, 67 S.Ct., at 513 that they may fairly be viewed as reflections of a neutral posture toward religious institutions. *Allen* is founded upon a similar principle. The Court there repeatedly emphasized that upon the record in that case there was no indication that textbooks would be provided for anything other than purely secular courses. *Id.* at 781–82, 93 S.Ct. 2955.

The Court found that the tuition grants involved in Nyquist were not restricted to supporting secular educational functions. *Id.* at 783, 93 S.Ct. 2955. The Court indicated that "the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions." *Id.* at 783, 93 S.Ct. 2955. The Court went on to further state that "if the grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions." *Id.* at 786, 93 S.Ct. 2955. It then included the following in a footnote, the language of which has been often quoted in subsequent Establishment Clause cases decided by the Court:

Because of the manner in which we have resolved the tuition grant issue, we need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (e.g., scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited. See *Wolman v. Essex,* 342 F.Supp. 399, 412—413 (S.D.Ohio), aff'd, 409 U.S. 808,93 S.Ct. 61, 34 L.Ed.2d 69 (1972). Thus, our decision today does not compel, as appellees have contended, the conclusion that the educational assistance provisions of the 'G.I. Bill,' 38 U.S.C. § 1651, impermissibly advances religion in violation of the Establishment Clause. See also n. 32, *supra.*

Defendants assert that the Program in this case can be distinguished from the program struck down in *Nyquist* because the purpose of the 1999 Voucher Program is to give low-income students in a severely distressed school district the option to attend private schools at taxpayer expense, whereas the program struck down in *Nyquist* was designed to provide a special benefit to sectarian schools.

A review of the purposes of the two programs reveals that any differences which exist between them are not sufficient to distinguish them on constitutional grounds. The articulated legislative purpose in *Nyquist* for the tuition reimbursement program was to ensure a pluralistic society, promote competitive and diverse alternatives to public education and ensure that low-income students not be denied those opportunities, and to make sure there was no precipitous decline in nonpublic school enrollment which would aggravate an existing crisis in public education, thereby jeopardizing education for all children. *Nyquist,* 413 U.S. at 765, 93 S.Ct. 2955. In order to qualify for the grants, a parent had to have an annual taxable income of less than $5,000 and grants were limited to the modest amount of $50 for each grade school child and $100 for each high school child. The court in *Nyquist* found the stated reasons for the program sufficient to meet the secular purpose test of *Lemon.* There is no question in this case that the articulated purpose of the Cleveland Pilot Program meets this test as well. Similar to *Nyquist,* the Program seeks to provide nonpublic school alternatives primarily to low-income students for acceptable reasons.

Thus, the question in each case is, "does the program under review have the effect of advancing religion?" The Court in *Nyquist* found the program at issue in that

case had this effect because the program provided unrestricted grants to parents as tuition reimbursement for their children to attend "nonpublic schools, the bulk of which is concededly sectarian in orientation." *Nyquist*, 413 U.S. at 780, 93 S.Ct. 2955. The Court reached this conclusion even in the face of a statute that made grants available to attend private schools, not just sectarian schools. A similar circumstance exists in the instant case; the grants are available by statute to attend registered private schools, including religious schools, as well as any participating adjacent public schools. Since *Nyquist* took account of the reality that an overwhelming majority of the schools at which students can utilize their grants were sectarian, it would seem appropriate that the Court should assess the reality of the opportunities available to students in this case.

In this case, Defendants concede that the overwhelming majority of schools from which a student may choose are sectarian and that no adjacent public school has chosen to participate in the Program. Also, as in *Nyquist*, the funds received by a school are not restricted to use for secular educational purposes. In all pertinent respects, the Program looks like *Nyquist* and would appear to be controlled by that precedent.

*Nyquist* has not been overruled. If *Nyquist* is precedent which is directly on point, this Court is constrained to follow it. As the Supreme Court recently stated in *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), in deciding to overrule one of its own precedents:

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "if a precedent to this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this

Court the prerogative of overruling its own decisions." Id. at 237, 117 S.Ct. 1997 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

Nevertheless, the Court will explore whether or not *Nyquist* has been undermined by subsequent Supreme Court cases and/or whether recent cases suggest there is a meaningful distinction between the program stricken down in *Nyquist* and that which is being challenged in this case. Defendants cite several cases in support of their position that *Nyquist* has been undermined and should not be followed and that the Cleveland Pilot Program can be meaningfully distinguished, most notably by *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), *Witters v. Washington Dept. of Serv. For the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) and *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). The Court will discuss each of those cases in turn.

### b. *Post–Nyquist Cases*

#### (i) *Mueller.*

In *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the U.S. Supreme Court upheld the constitutionality of a Minnesota statute which allowed state taxpayers to deduct, when computing their state income tax, certain tuition, transportation and educational expenses actually incurred in sending their children to elementary or secondary schools. It found that the program complied with each of the three parts of the *Lemon* test. The court determined that the program had a secular legislative purpose, stating:

> A State's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—evidences a purpose that is both secular and under-

standable. An educated populace is essential to the political and economic health of any community, and a State's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the State's citizenry is well educated. Similarly, Minnesota, like other States, could conclude that there is a strong public interest in assuring the continued financial health of private schools, both sectarian and nonsectarian. By educating a substantial number of students such schools relieve public schools of a correspondingly great burden—to the benefit of all taxpayers. In addition, private schools may serve as a benchmark for public schools, in a manner analogous to the "TVA yardstick" for private power companies. *Id.* at 395, 103 S.Ct. 3062.

The Court also concluded the program did not have the primary effect of advancing religion. The Court noted that the tax deduction was one of many provided under the Minnesota tax laws and that their "decisions consistently have recognized that traditionally '[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes,' *Regan v. Taxation with Representation of Wash.,* 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)...." *Id.* at 396, 103 S.Ct. 3062.

The Court found it especially significant that the deduction was available for education expenses incurred by all parents, whether their children attended public schools, nonsectarian private schools or sectarian private schools. *Id.* at. 397, 103 S.Ct. 3062. The Court found this aspect of the statute, as well as others, to be "vitally different from the scheme struck down in *Nyquist.* There, public assistance amounting to tuition grants was provided only to parents of children in nonpublic schools." *Id.* at 398, 103 S.Ct. 3062. The Court recounted that in striking down the New York statute, it had noted the difference between that statute and those involved in *Everson,* providing a tax deduc-

tion to the parents for the bus fare of all children who attended school, whether public or private and *Allen,* which provided textbooks for secular subjects to all children, regardless of whether they attended public or private school. *Id.* The Court found the tax deduction involved to be more like the type of program discussed in footnote 38 of *Nyquist,* wherein the Court "intimated that 'public assistance (e.g., scholarships) made available generally without regard to the sectarian, nonsectarian, or public, nonpublic nature of the institution benefited,' (citation omitted) might not offend the Establishment Clause." *Id.*

While acknowledging that "financial assistance provided to parents ultimately has an economic effect comparable to aid given directly to the schools attended by their children," the Court found it important that the assistance to parochial schools was channeled through parents rather than directly provided to parochial schools. *Id.* at 399, 103 S.Ct. 3062. "[U]nder Minnesota's arrangement, public funds become available only as a result of numerous private choices of individual parents of school-age children." *Id.*

As discussed above, the Supreme Court in *Mueller* clearly did not see itself as undermining *Nyquist;* it took pains to distinguish it. Defendants argue that they, nevertheless, comply with the dictates of *Mueller* and footnote 38 of *Nyquist.* They maintain they have devised a neutral program made generally available without regard to the sectarian-nonsectarian or public-nonpublic nature of the institutions benefitted. They further argue that any benefit received by a sectarian institution is received as a result of the private choice of the individual parents. The Defendants also argue that this Court should not consider the number of parochial schools involved in the Program as evidence of an Establishment Clause violation because the Court in *Mueller* indicated it would not consider the extent to which nonsectarian schools might benefit by the tax de-

duction provided there by comparison to other institutions.

On analysis, the Court finds the Program at issue distinguishable in at least two pertinent respects from *Mueller.* First, under the Cleveland Pilot Program, parents and their children do not have a significant choice between public and private school. No adjacent public school participates in the Program. Parents and their children do not have a significant choice between parochial and non-parochial schools; among registered schools, parochial schools overwhelmingly predominate. This Program is unlike the tax program in *Mueller* where parents and children could make an independent choice between public and private schools, including religious schools, and where parents received a tax deduction for expenses associated with attendance at either. Second, while it is pertinent to consider the extent to which the money flowing to a sectarian institution is as a result of the private choice of parents, the nature of the parental choice is not sufficient here to break the nexus between the state and the religious institution. As stated earlier, under the Program, the overwhelming majority of participating schools are religious in nature. The choice is unlike that in *Mueller* where the program was found to be neutral and made available without regard to the sectarian-nonsectarian or public-nonpublic nature of the institutions benefitted. Furthermore, any aid received by a religious institution as the result of a tax benefit claimed by parents is by its very nature more attenuated than the benefits conferred under the Cleveland Plan, where benefits are conferred to specifically pay tuition.

Moreover, contrary to Defendants' assertions, *Mueller* cannot be fairly read as repudiating the obligation of the Courts in the first instance to see whether the state program is indeed genuinely neutral and made available without regard to the parochial, non-parochial or private, non-private

nature of its beneficiaries. *Mueller* holds that if a court finds that the above requirements have been met, it will not find that the Establishment Clause has been violated on statistical evidence that citizens have exercised their private choices in ways that benefit sectarian institutions more than nonsectarian institutions. Over the dissent of Justices Marshall, Brennan, Blackmun and Stevens, the Court found, on analysis, that the program met these criteria. Having reached this conclusion, it indicated it would not bottom constitutionality on a determination of the extent to which sectarian or nonsectarian schools were the actual beneficiaries. *Id.* at 409, 103 S.Ct. 3062.

(ii) *Witters.*

In *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), the Supreme Court upheld the constitutionality of a State of Washington program extending vocational rehabilitation assistance to a blind person to attend a Christian college to become a pastor, missionary or youth director. In regard to the first part of the *Lemon* test, whether the program served a secular purpose, the court stated:

> Our analysis relating to the first prong of that test is simple: all parties concede the unmistakably secular purpose of the Washington program. That program was designed to promote the well-being of the visually handicapped through the provision of vocational rehabilitation services, and no more than a minuscule amount of the aid awarded under the program is likely to flow to religious education. *Id.* at 485–86, 106 S.Ct. 748.

In addressing the effects prong of the test, the Court cited *Nyquist* as a case where the effect of the aid given resulted in an impermissible direct subsidy by the state to the religious school, even though it was in the form of aid to the students or their parents. *Id.* at 487, 106 S.Ct. 748. It found, however, that the vocational assistance program at issue did not amount

to a direct subsidy. *Id.* at 488, 106 S.Ct. 748. The Court concluded:

> that "the vocational assistance provided ... is paid directly to the student, who transmits it to the educational institution of his or her choice." Any aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients. *Id.*

To clearly distinguish this case from the program involved in *Nyquist,* the Court cited to footnote 38 of *Nyquist* stating, "Washington's program is 'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted.' *Committee for Public Education & Liberty v. Nyquist,* 413 U.S. at 782–83, n. 38, 93 S.Ct. 2955 ..." *Id.* at 488, 106 S.Ct. 748. It noted that it neither gives greater benefits to those who attend religious institutions, "nor are the full benefits of the program limited, in large part or in whole, to students at sectarian institutions." *Id.* Students could expend their education grants on wholly secular education if they wished to and could choose from "a huge variety of possible careers, of which only a small handful are sectarian." *Id.* Furthermore, the Court found that "[a] program, providing vocational assistance to the visually handicapped, does not seem well suited to serve as the vehicle for such a subsidy." *Id.* For these reasons and others discussed by the Court, it found the link between state and the religious institution to be attenuated. *Id.*

A review of *Witters* demonstrates that it did not view itself as departing from *Nyquist* or undermining it, but rather as approving of the type of scholarship which the *Nyquist* Court said in footnote 38 of its opinion it had no occasion to consider. Indeed, the *Witters* Court distinguished the program at issue in that case from the one in *Nyquist.*

While the program did make scholarship aid available to a student which could be directly applied to pursue a religious career at a religious institution, critical differences exist between that case and this one. In *Witters,* the Court found, unlike the situation in *Nyquist,* the student had a genuine choice between sectarian and nonsectarian and between public and nonpublic institutions. Indeed, he had a choice between pursuing religious and non-religious vocations. Because he could utilize the aid however he chose, the provision of the scholarship would have no effect on his choice of an institution. Though a religious institution might benefit, it would be only as a direct result of the choice of the student, not as the result of the state providing a benefit to religious institutions. Contrarily, under the Cleveland Scholarship Program, clearly the provision of the scholarship has an effect on parental and student choice because the overwhelming majority of participating schools are religious in nature.

(iii) *Zobrest.*

In *Zobrest v. Catalina Foothills School District,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), the Supreme Court held that providing the services of an interpreter to a deaf student attending a Catholic high school pursuant to the Individual With Disabilities Education Act (IDEA), 20 U.S.C. § 1407 *et seq.,* and its Arizona counterpart did not violate the Establishment Clause. The student had previously attended public school where he was furnished such an interpreter. Relying heavily on *Mueller, Witters* and footnote 38 of the *Nyquist* opinion, the Court found that the effect of the government program was not to promote religion. *Id.* at 10, 113 S.Ct. 2462.

> By awarding parents freedom to select a school of their choice, the statute insures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents. In other words, because the IDEA creates no financial incentive for parents to choose a sectarian school, an

interpreter's presence there cannot be attributed to state decisionmaking.... When the government offers a neutral service on the premises of a sectarian school as part of a general program that 'is no way skewed toward religion,' *Witters, supra,* at 488, 106 S.Ct. 748, ... it follows under our prior decisions that provision of that service does not offend the Establishment Clause. *Id.*

The Court found the case to be easier than *Mueller* and *Witters* because no state monies that were traceable to the government went to religious institutions. *Id.* In reaching its decision, the Court rejected the argument that because the provision of services provided by the state took place on the premises of the religious institution, the program had the primary effect of supporting religion. The Court distinguished this case from *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and *School District of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). In *Zobrest,* the Court described the statute struck down in *Meek* as providing " 'massive aid' to private schools—more than 75% of which were church related—through a direct loan of teaching material and equipment (citation omitted)." *Id.* at 11, 113 S.Ct. 2462. The program also provided for the use of state personnel to provide "auxiliary services", including counseling and remedial and accelerated instruction. *Id.* The program involved in *Ball* also included the provision of services on the premises of the private school, the teaching of classes in buildings at the institution.

The Court found the program in *Zobrest* to be distinguishable from those in *Meek* and *Ball* in two important respects. First, the direct grants of aid by the government in those two cases "relieved sectarian schools of costs they would otherwise have borne in educating their students." *Id.* (citation omitted). The Court determined the result in *Zobrest* to be otherwise, concluding that the school in that case would not be relieved of any such expenses; any

benefit it received was attenuated and was the result of the private choice of parents. *Id.*

Second, the Court found "the task of a sign interpreter [to be]—quite different from that of a teacher or guidance counselor," and concluded that there was nothing to suggest that the interpreter could do anything other than interpret the materials being presented to the class. *Id.*

There is nothing in the *Zobrest* opinion which can be read as undermining *Nyquist.* The furnishing of a sign interpreter did not place any money in the coffers of a religious institution. This was also a program made available to students without regard to where they attended school. It was in no way skewed toward religion. Therefore, it could not be said that the provision of service had an effect on the parent's choice of an educational institution. Any incidental benefit received by the school occurred only as the result of parental choice. Furthermore, the sign interpreter would not be introducing religious content into the school but would have the responsibility for neutrally interpreting regular classes at school. For all of these reasons, the Cleveland Program is distinguishable from that in *Zobrest.*

(iv) *Agostini.*

The most recent case which sheds some light on the question involved herein is *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). In that case, the Supreme Court overruled its prior decision in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), that the Establishment Clause barred New York City from sending public school teachers into parochial schools to provide remedial education to disadvantaged children under a congressionally mandated program, Title I of the Elementary and Secondary Education Act of 1965. As a result of the Court's ruling in *Aguilar,* New York was required to spend an average of $15 million in additional costs to

provide the necessary services to eligible students attending private schools, including costs for leasing a site, mobile instructional units and for transportation costs to get the students to and from the site. *Agostini,* 521 U.S. at 213, 117 S.Ct. 1997.

In addressing whether the Title I program violated the Establishment Clause, the Court reviewed its reasoning in *Aguilar* and its companion case *Ball,* which involved programs implemented by the City of Grand Rapids, Michigan, where nonpublic school students were taught supplemental courses by public school teachers during the regular school day on the premises of the nonpublic school. *Id.* at 218–222, 117 S.Ct. 1997. The Court then concluded that the assumptions on which *Aguilar* and *Ball* had relied had been undermined by more recent Supreme Court cases. *Id.* The Court indicated, however, that the basic principles of Establishment Clause jurisprudence had not changed. The Court then explained its current approach.

In evaluating whether the Establishment Clause is violated, it is still pertinent to inquire whether the program has a secular purpose and the inquiry to reach this determination has not changed. It is also still pertinent to inquire whether the aid has the effect of advancing religion. The Court stated "[w]hat has changed ... is our underestimating of the criteria used to assess whether aid to religion has an impermissible effect." *Id.* at 223, 117 S.Ct. 1997. This understanding had changed in two significant ways. First, the Court found that in cases decided subsequent to *Meek* and *Ball,* such as *Zobrest,* it had rejected the presumption in those cases "that the placement of public employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." *Id.* It concluded that just as it saw no reason to presume that the language interpreter in *Zobrest* would use that position to inculcate religion, it saw no reason

to assume that other employees would do so. *Id.* at 225, 117 S.Ct. 1997.

Second, citing *Witters,* the Court indicated that it had departed from the rule "that all government aid which directly aids the educational future of religious schools is invalid." *Id.* The cases where departure is warranted are those in conformity with the requirements discussed in footnote 38 of *Nyquist,* as demonstrated by *Witters:* grants which are "made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted." *Id* at 225, 117 S.Ct. 1997. As the court stated in *Witters,* money goes to religious institutions as a result of a " 'genuinely independent and private choice of individuals.' " *Id* at 226, 117 S.Ct. 1997 (citation omitted).

■ The Court does not find that the *Agostini* case undermines the vitality of *Nyquist* either. Even while reversing its prior decision in *Aguilar* so that Title I services could be provided to students on the grounds of religious institutions, it simply allowed students attending parochial schools to obtain remedial educational benefits which were made generally available to qualifying students without regard to the nature of the institution attended. The provision of services would have no effect on a student's choice of what school to attend. In one sense, it is like providing textbooks in math or science to all students regardless of the school they attend. Indeed, no monies went into the coffers of the religious institution and there clearly was no direct support for religious institutions. The *Agostini* Court, while acknowledging that it no longer applied an absolute rule that all direct aid which supports religious institutions was barred by the Establishment Clause, noted that the circumstances where such aid had been found permissible was in the context of cases like *Witters,* a class of cases which *Nyquist* did not address. On comparison of the Scholarship Program in this case with the program involved in *Agostini,* the Court concludes that the cases are signifi-

cantly different. In this case, unlike in *Agostini,* monies would go directly to support the regular educational program of a religious institution including, in some cases, religious instruction. Moreover, as stated earlier, the provision of the services under the Cleveland Program would impact whether a person chose a religious institution, whereas they did not in *Agostini.*

For the reasons stated above, the Court does not find the Supreme Court of Ohio's opinion persuasive on the Establishment Clause issue.

### B. *Will Plaintiffs Suffer Irreparable Harm?*

Because the Court concludes that Plaintiffs have a strong likelihood of success on the merits, it finds also that there is a substantial likelihood that they will suffer irreparable harm.

### C. *Will Others Suffer Substantial Harm?*

The parties stipulated that testimony might be presented by way of affidavits for the preliminary injunction hearing. The Court has reviewed all of the affidavits including a large number submitted by the Defendants and Intervenors attesting to the harm which the children and others might suffer if the Program is enjoined. Among the affidavits were those of children, parents, principals and administrators of registered schools and a panel of psychiatrists who interviewed selected school children and their families to assess the harm which might be caused to them. Affidavits of professors of psychology, education and public administration were supplied, including an affidavit from Robert Coles, M.D., a professor of psychiatry and medical humanities at Harvard Medical School.

In some of the affidavits, the professionals spell out the various types of harm which children may suffer when their lives are disrupted. They lose friendships and sometimes a sense of continuity of purpose. Students might suffer a sense of loss of security and stability, depending on their family circumstances. Also, their emotional, social and personal development could be severely disrupted. The parents, principals and administrators, teachers and students attest to the positive role that the alternative schools have played in their lives.

The Court credits the testimony regarding potential harm to the students caused by disruption of the Program, but finds that it is insufficient to overcome the fact that Plaintiffs' likelihood of success on the merits is great.

### D. *Is the Granting of an Injunction in the Public Interest?*

Because the Court finds that Plaintiffs have a substantial likelihood of success on the merits, it finds that it is substantially in the public interest to grant an injunction.

## III. CONCLUSION

On thoroughly reviewing and balancing all of the necessary factors, the court concludes that the Cleveland Pilot Scholarship Program should be enjoined. Though Defendants have amassed substantial support regarding the harm the children who will not be able to pursue the Program and others will suffer, that harm cannot be dispositive where the Court concludes that there is no substantial possibility that it will ultimately conclude in their favor. Indeed, the Court has concluded that Plaintiffs have a very substantial chance of succeeding on the merits. The Cleveland Program does not make aid available without regard to the nature of the schools to be benefitted. The participating schools are overwhelmingly sectarian. This means that parents cannot make an educational choice without regard to whether the school is parochial or not. Consequently, the Cleveland Program has the primary effect of advancing religion. Failing to grant the injunction under such circumstances would not only be contrary to law, but could cause an even greater harm to

the children by setting them up for greater disruption at a later time. Therefore, the injunction is granted and the Defendants are enjoined from instituting or continuing to administer this Program pending the outcome of a decision on the merits in this case.

IT IS SO ORDERED.